Ralph NADER and Friends of the
Earth, Petitioners,

v.

NUCLEAR REGULATORY COMMIS-
SION and the United States of
America, Respondents,

Carolina Power and Light Co. et al.,
Southern California Edison Co., and
San Diego Gas & Electric Co., Interve-
nors.

No. 73–1872.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 24, 1974.

Decided May 30, 1975.

Anthony Z. Roisman, Washington, D. C., with whom Myron M. Cherry, Chicago, Ill., was on the brief, for petitioners.

Guy H. Cunningham, III, Atty., Atomic Energy Commission, with whom Wallace A. Johnson, Asst. Atty. Gen., Marcus A. Rowden, Gen. Counsel, and Jerome Nelson, Sol., Atomic Energy Commission, and Edmund B. Clark, Atty., Dept. of Justice, were on the brief, for respondents.

George C. Freeman, Jr., Donald P. Irwin, David S. Brollier, Richmond, Va., Arvin E. Upton, Harry H. Voigt and Eugene R. Fidell, Washington D. C., were on the brief for intervenors Carolina Power and Light Company, and others, John J. Adams, Washington, D. C., also entered an appearance for intervenors Carolina Power and Light Co., and others.

C. Hayden Ames, San Francisco, Cal., Rollin E. Woodbury and Alan M. Nedry, Rosemead, Cal., entered appearances for intervenors Southern California Edison Co. and San Diego Gas & Electric Co.

Before McGOWAN, and ROBINSON, Circuit Judges and WEIGEL,* United States District Judge for the Northern District of California.

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

Opinion for the Court filed by Circuit Judge Robinson.

**SPOTTSWOOD W. ROBINSON, III, Circuit Judge:**

We are summoned to review an order of the Atomic Energy Commission, predecessor of the Nuclear Regulatory Commission,[1] denying a petition seeking a shutdown or derating of twenty nuclear power plants licensed for operation in various parts of the Nation. The petition is grounded on the premise that the effectiveness, as safety measures, of the emergency core cooling systems[2] of the reactors utilized at these plants has not been suitably established. The Commission held that the questioned systems fully conformed to the design standards applicable, and that immediate shutdown or derating of the reactors was unwarranted.[3] We have examined petitioners' claim with a concern commensurate with our judicial responsibilities, in this case heightened by our sensitivity to the potentially disastrous consequences of unsafe nuclear ventures. We conclude that the Commission's order refusing relief should be affirmed.

I

Nuclear power reactors typically generate thermal energy through a process of controlled fission reaction in the reactor core.[4] The energy is absorbed by cooling water circulating through and around the core,[5] and ultimately is converted into steam which drives turbines to produce electric power.[6] Reactor safety is promoted by a "defense in depth"[7]—a combination of numerous protective features, of which the emergency core-cooling system[8] is but one.[9] The function of that system is to reflood the core with cooling water[10] in the event of a loss-of-coolant accident.[11]

On February 20, 1971, the Atomic Energy Commission adopted, for effective operation the following May, a bundle of "General Design Criteria"[12] for light-water nuclear power reactors.[13] One,

---

1. See Energy Reorganization Act of 1974, Pub.L. No. 93–438, tit. II, 88 Stat. 1233, 1242–1248 (1974). Our review is unaffected by the transfer of functions from the one agency to the other while this case was under submission. Id. tit. III, § 301(d), (f), 88 Stat. 1249 (1974). References herein to the "Commission" are, of course, to the Atomic Energy Commission.

2. See note 8, infra, and text infra at notes 4–11.

3. Petition for Shutdown of Certain Reactors, 38 Fed.Reg. 23815 (1973), hereinafter "Shutdown Petition."

4. See Atomic Energy Commission, Final Environmental Statement Concerning Proposed Rule Making Action: Acceptance Criteria for Emergency Core Cooling Systems for Light-Water Cooled Nuclear Power Reactors, Docket No. RM–50–1, at 8–16 (1973), hereinafter "Environmental Statement."

5. The core of a nuclear reactor is the central portion containing the fuel elements.

6. Environmental Statement, supra note 4 at 13–14.

7. Acceptance Criteria for Emergency Core Cooling Systems for Light-Water Cooled Nuclear Power Reactors, Docket No. RM–50–1, at 6 (Dec. 28, 1973), hereinafter "Acceptance Criteria." The defense-in-depth principle embraces three levels of safety to prevent and control the effects of a wide spectrum of postulated hypothetical accidents. The first is conservatism in design of, and stringent quality control over components; the second is a requirement of protective devices and systems to detect and contain abnormal conditions; and the third is a requirement of backup systems. For a further discussion, see Environmental Statement, supra note 4, at 16–21.

8. The emergency core cooling system is a combination of pipes, pumps, valves, tanks and other devices serving the function hereinafter described in text.

9. Acceptance Criteria, supra note 7, at 20.

10. See notes 14, 16, infra.

11. The Commission's regulations define "[l]oss of coolant accidents" as "those postulated accidents that result from the loss of reactor coolant at a rate in excess of the capability of the reactor coolant makeup system from breaks in the reactor coolant pressure boundary, up to and including a break equivilent in size to the double-ended rupture of the largest pipe of the reactor coolant system." 10 C.F.R. tit. 50 app. A (1974).

12. Id.

13. A light-water cooled nuclear power reactor is one in which the core is cooled by ordinary light water, as distinguished from heavy water which contains atoms of deuterium instead of hydrogen.

General Design Criterion 35, specified that "[a] system to provide abundant emergency core cooling shall be provided." [14] On June 29, 1971, the Commission published an "Interim Policy Statement" [15] detailing four "Interim Acceptance Criteria," [16] operative at once,[17] "in order to give immediate effect to standards developed on the basis of new information arising in the course of industry design changes in, and AEC semiscale testing of," emergency core cooling systems.[18] The policy statement explained that "ongoing industry and AEC pro-

grams [had] produced a large amount of information not available at the time of earlier reviews," [19] and that the Interim Acceptance Criteria were promulgated to reflect emerging technological data.[20]

Shortly thereafter, on November 30, 1971, the Commission launched a comprehensive rulemaking proceeding to enable further exploration of scientific opinion as to possible refinements of the Interim Acceptance Criteria.[21] The burden of the inquiry was an evaluation of the sufficiency of those criteria to prevent loss-

---

**14.** In its entirety, General Design Criterion 35 reads:

A system to provide abundant emergency core cooling shall be provided. The system safety function shall be to transfer heat from the reactor core following any loss of the reactor coolant at a rate such that (1) fuel and clad damage that could interfere with continued effective core cooling is prevented and (2) clad metal-water reaction is limited to neglegible amounts.

Suitable redundancy in components and features, and suitable interconnections, leak detection, isolation, and containment capabilities shall be provided to assure that for onsite electric power system operation (assuming offsite power is not available) and for offsite electric power system operation (assuming onsite power is not available) the system safety function can be accomplished, assuming a single failure.

10 C.F.R. § 50, App. A, 287, 292 (1974).

**15.** Criteria for Emergency Core Cooling Systems for Light-Water Power Reactors, Interim Policy Statement, 36 Fed.Reg. 12247 (1971), hereinafter "Interim Policy Statement." The Interim Policy Statement was corrected once, 36 Fed.Reg. 13105 (1971), and amended once, 36 Fed.Reg. 24082 (1971).

**16.** The Interim Acceptance Criteria read as follows:

IV. A. *Criteria for all light-water power reactors.* These general requirements have been the basis of AEC safety review for some time. On the basis of today's knowledge, the performance of the emergency core cooling system is judged to be acceptable if the calculated course of the loss-of-coolant accident is limited as follows:

1. The calculated maximum fuel element cladding temperature does not exceed 2,300° F. This limit has been chosen on the basis of available data on embrittlement and possible subsequent shattering of the cladding. The results of further detailed experiments could be the basis for future revision of this limit.

2. The amount of fuel element cladding that reacts chemically with water or steam does not exceed 1 percent of the total amount of cladding in the reactor.

3. The clad temperature transient is terminated at a time when the core geometry is still amenable to cooling, and before the cladding is so embrittled as to fail during or after quenching.

4. The core temperature is reduced and decay heat is removed for an extended period of time, as required by the long-lived radioactivity remaining in the core.

B. *Criteria for specific reactors.* Each reactor shall be evaluated in accordance with the general criteria of section IV.A., and using a suitable evaluation model. Examples of acceptable evaluation models are described in Appendix A. These evaluation models are acceptable to the Commission but their use is not mandatory. Other evaluation models may be proposed by applicants for review in individual cases.

36 Fed.Reg. at 12248 (Footnotes omitted).

**17.** *Id.* The Interim Policy Statement invited interested persons to submit, within 60 days, written comments and suggestions for consideration "with the view to possible amendments." Interim Policy Statement, *supra* note 15, 36 Fed.Reg. at 12250. The public was also informed that the Commission would "consider holding an informal public rule making hearing on this interim policy statement." *Id.*

**18.** Union of Concerned Scientists v. AEC, 163 U.S.App.D.C. 64, 75, 499 F.2d 1069, 1080 (1974). In addition to the interim criteria, the Interim Policy Statement also set forth "evaluation models" as prescriptions for acceptable emergency core cooling system designs. Interim Policy Statement, *supra* note 15, 36 Fed. Reg. at 12249–12250.

**19.** See note 14, *supra.*

**20.** See note 14, *supra.*

**21.** Acceptance Criteria, *supra* note 7, at 1–2.

of-coolant accidents, and to determine whether the criteria should be permanently adopted and, if so, with what modifications.[22] To complement the investigation, a draft environmental statement was prepared and circulated for public comment.[23] Subsequent to submission of this case, the rulemaking proceeding was completed and the Commission announced the results.[24] There were some deviations from the Interim Policy Statement, but three of the four original Interim Acceptance Criteria were left intact with modifications in language.[25]

## II

Petitioners' current effort did not originate as a part of the administrative litigation concerning requirements for emergency core cooling systems. They were not participants in the proceeding forerunning promulgation of the General Design Criteria, or that following publication of the Interim Acceptance Criteria,[26] nor did they seek judicial review of either after adoption. The petition for review before us ventures beyond a challenge to the emergency core cooling systems in terms of conformity with applicable regulations. In no small degree, it is the second of two collateral attacks which petitioners have launched upon the adequacy of the Acceptance Criteria as safety measures.

The first attack came in an action in the District Court for the District of Columbia wherein petitioners sought injunctive relief against further operation of the reactors and ultimately the revocation of the licenses authorizing their use.[27] Prominent among petitioners' arguments was the contention that compliance with the Acceptance Criteria did not alone insure the effectiveness of emergency core cooling systems.[28] In denying preliminary injunctive relief, the court concluded that it was unlikely that petitioners would suffer irreparable injury or ultimately prevail on the merits,[29] and that the adverse economic impact of an injunction upon the utilities and to the public would be "substantial."[30] Proceeding beyond that ruling, the court dismissed the action on the grounds that petitioners had failed to invoke and exhaust available administrative remedies,[31] and that in permitting operation of the reactors under the Acceptance Criteria there was "no violation of a 'clear, nondiscretionary legal duty' by the" Commission.[32] An appeal from the District Court's rulings was taken, but later was dismissed by agreement of the parties.[33]

Petitioners then turned to the Commission for the shutdown,[34] raising precisely the same issues previously tendered to the District Court.[35] Treating, upon a formidable record,[36] their petition as a request that it "issue, amend, or rescind [a] regulation,"[37] the Commission issued a memorandum opinion and order denying the request.[38] The Com-

---

22. *Id.* at 2.

23. See note 4, *supra.* The formulation and circulation of this statement was required by the National Environmental Policy Act of 1969, Pub.L.No.91–190, 83 Stat. 852, 42 U.S.C. § 4321 et seq. (1970).

24. Acceptance Criteria, *supra* note 7.

25. *Id.* at 25–26.

26. See note 7, *supra.*

27. Nader v. Ray, 363 F.Supp. 946 (D.D.C. 1973).

28. *Id.* at 949.

29. *Id.* at 955.

30. *Id.* at 953.

31. *Id.* at 954.

32. *Id.* at 955.

33. Counsel have agreed that the District Court's decision has no res judicata or collateral estoppel effect in this case.

34. Shutdown Petition, *supra* note 3.

35. "The petition sought the same relief requested in Nader v. Ray, 'based on the identical facts, the identical affidavits and the identical contentions. . . .'" *Id.,* quoting from the petition.

36. The record before the Commission consisted in the shutdown petition, comments submitted by interested parties, and the entire record compiled in Nader v. Ray, *supra* note 27.

37. *Id.*

38. *Id.* at 23816.

mission referred to its formulation of General Criterion 35,[39] its subsequent promulgation of the Acceptance .Criteria as implementations,[40] and the then pending rulemaking investigation as to whether the Acceptance Criteria should be retained in their present form or some other.[41] The Commission noted that the extensive rulemaking proceeding[42] had recently been submitted to it for final decision, and that it was anticipated that the decision would soon be forthcoming.[43]

Against this backdrop, the Commission addressed petitioners' claim that the plants in question should be shut down because compliance with the Acceptance Criteria did not "assure" the effectiveness of the emergency core-cooling systems:

> Neither the statute nor the Commission regulations in issue . . . require such an unattainable guarantee of risk-free operation. . . . We do not live in a risk-less society, nor could modern technological societies exist on that basis. We are, of course, aware of the potential risks in nuclear matters if safety is not given the very close attention it deserves. In this regard, the [loss-of-coolant accident] has been characterized as "perhaps the most-studied hypothetical accident in history"[44] . . . . These studies continue. It is precisely because of this perceived risk that we have always imposed stringent and overlapping protective measures in implementing the concept of defense in depth. However we cannot—and do

not—claim "assurance" as an absolute.[45]

"Rather," the Commission continued, "the regulatory process turns upon the concept of 'reasonable assurance' to public health and safety."[46]

The Commission then found that "[m]easured by this standard, . . . reactors operating under the [Interim Acceptance Criteria] provide reasonable assurance of protection to the public health and safety in the highly unlikely event of a major loss-of-coolant accident."[47] It elaborated:

> Petitioners case ignores the substantial showing of scientific and engineering support for the [Interim Acceptance] Criteria. . . . Of course there is a variety of expert opinion in the [emergency core-cooling system] rulemaking record—ranging from those who take the view that even the Interim Criteria are too conservative to those few who have reservations about some aspect. None of the experts upon whom petitioners rely supports the extraordinary relief they seek. . . . We have not been shown, nor have we found, any factual basis which would warrant short-circuiting the orderly culmination of the [emergency core-cooling system] rulemaking proceeding. On the record presented in the instant case, we specifically reaffirm our conclusion that compliance with the [Interim Acceptance Criteria] provides reasonable assurance that emergency core cooling systems will adequately protect the public health and safety.[48]

Accordingly, the Commission concluded that there was "neither an 'undisputed

39. *Id.* at 23815.

40. *Id.*

41. *Id.*

42. The Commission pointed out that the record in the rulemaking proceeding involved "months of hearings, over 22,000 pages of transcript, and thousands of pages of exhibits. . . ." *Id.*

43. *Id.* at 23815–23816.

44. Quoting from an affidavit.

45. *Id.* at 23816. The Commission stated further that "[r]esting upon an assumed (but im-

possible) standard of 100 percent assurance, petitioners build their case upon what they claim is the 'undisputed inadequacy of the Interim Acceptance Criteria.' But the [Interim Acceptance Criteria] can be viewed as 'inadequate' only if petitioners' notion of absolute risklessness is accepted. We reject petitioners' attempt to bootstrap their theory into a conclusion of inadequacy." *Id.*

46. *Id.*

47. *Id.*

48. *Id.*

inadequacy of the Interim Acceptance Criteria,' an inability to make the required finding of reasonable assurance with respect to the public health and safety, nor any violation of the Commission's regulations." [49] The shutdown petition was denied, and this appeal followed.

### III

█ To establish the basis for our consideration of the petition for review, we pause briefly to identify the perameters of our inquiry and the legal criterion by which we measure the Commission's action. The shutdown petition did not ask for an administrative hearing, nor was such a hearing required [50] or conducted; the Commission characterized the petition as a request to amend or rescind a regulation,[51] a procedure which the Commission's rules authorize [52] but specifically relieve from need for an evidentiary hearing.[53] Accordingly, the standard for our review is not the substantial evidence test applicable in other contexts,[54] but whether the action in question was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." [55] In this view, we understand, all litigants concur.

The theme of the petition for review is that the Commission's refusal to order a shutdown was "not in accordance with law." The "law" allegedly dishonored is the call by General Design Criterion 35 for "a system to provide abundant emergency core-cooling." [56] Petitioners argue syllogistically (a) that an agency must comply with its own regulations; (b) that one of the regulations with which all light-water nuclear power reactors must comply is Criterion 35; (c) that there must be a definitive finding of compliance with that standard; (d) that the Interim Acceptance Criteria do not insure an effective emergency core cooling system; and (e) that therefore the Commission's finding in this case that the challenged reactors meet with the Acceptance Criteria is not a sufficient finding that they satisfy Criterion 35.

█ To be sure, an administrative agency is bound not only by the precepts of its governing statute but also by those incorporated into its own regulations,[57] which in the instant case importantly include Criterion 35. It is equally well settled "that an agency or commission must articulate with clarity and precision its findings and the reasons for its decisions," [58] here the holding that all Commission regulations had been observed. We cannot agree, however, that the Acceptance Criteria did not promise the same degree of effectiveness in emergency core cooling systems as Criterion 35 does. Consequently, we reject the argument that a finding of compliance with the Acceptance Criteria is not acceptable as a determination that Crite-

**49.** *Id.*

**50.** The Atomic Energy Act confers the right to a hearing upon request in rulemaking proceedings. 42 U.S.C. § 2239(a) (1970). As stated in text, however, the shutdown petition did not request a hearing.

**51.** See text *supra* at note 37.

**52.** 10 C.F.R. § 2.802 (1974).

**53.** 10 C.F.R. § 2.803 (1974). *See also* Siegel v. AEC, 130 U.S.App.D.C. 307, 314, 400 F.2d 778, 785 (1968).

**54.** See, *e. g.*, Administrative Procedure Act § 10(e)(B)(5), 5 U.S.C. § 706(2)(E) (1970); Universal Camera Corp. v. NLRB, 340 U.S. 474, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456, 469 (1951).

**55.** Administrative Procedure Act § 10(e)(B)(1), 5 U.S.C. § 706(2)(A) (1970).

**56.** See note 14, *supra,* and accompanying text.

**57.** *See, e. g.,* Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); Vitarelli v. Seaton, 359 U.S. 535, 539, 79 S.Ct. 968, 972, 3 L.Ed.2d 1012, 1016–1017 (1959).

**58.** WAIT Radio v. FCC, 135 U.S.App.D.C. 317, 320, 418 F.2d 1153, 1156 (1969), cert. denied, 409 U.S. 1027, 93 S.Ct. 461, 34 L.Ed.2d 321 (1972). *Accord,* Baltimore & O. R.R. v. Aberdeen & R. R.R., 393 U.S. 87, 92, 89 S.Ct. 280, 283, 21 L.Ed.2d 219, 224 (1968); USV Pharmaceutical Corp. v. Secretary of HEW, 151 U.S. App.D.C. 284, 290–291, 466 F.2d 455, 461–462 (1972); Environmental Defense Fund v. Ruckelshaus, 142 U.S.App.D.C. 74, 88, 439 F.2d 584, 598 (1971).

rion 35's specification of "abundant emergency core cooling" has been met.

As a precondition to grant of a license for operation of a nuclear facility, the Atomic Energy Act explicitly requires a Commission finding that the licensed facility will afford "adequate protection to the health and safety of the public."[59] The Commission has long interpreted this provision as a demand for "reasonable assurance" of that protection,[60] and the Supreme Court, in its *Power Reactor* decision[61] has squarely sustained that administrative construction.[62] Indeed, in the proceeding under review, the Commission reaffirmed its position that "the regulatory process turns upon the concept of 'reasonable assurance' to public health and safety."[63]

The reasonable assurance standard is the hallmark of many of the Commission's safety regulations,[64] and indubitably is the benchmark utilized by the General Design Criteria and by the Interim Acceptance Criteria as well. In the introduction of the General Design Criteria, the Commission explained that the standards they embody "establish the necessary design, fabrication, construction, testing and performance requirements for structures, systems, and components important to safety,"[65] and that the "structures, systems, and components" to which they relate are those "that provide reasonable assurance that the facility can be operated without undue risk to the health and safety of the public."[66] In the Interim Policy Statement announcing the Interim Acceptance Criteria, the Commission again emphasized that "[p]rotection against a highly unlikely loss-of-coolant accident" as "an essential part of the defense-in-

depth concept used . . . to assure the safety of nuclear power plants,"[67] and again expressed its belief that "these criteria for emergency core cooling systems provide reasonable assurance that such systems will be effective in" that improbable eventuality.[68]

More importantly, it is evident that the General Design Criteria, as their name implies, were intended to provide engineering goals rather than precise tests or methodologies by which reactor safety could be fully and satisfactorily gauged. From the very beginning, the Commission acknowledged that they merely "establish[ed] minimum requirements for the principal design criteria for water-cooled nuclear power plants similar in design and location to plants for which construction permits have been issued by the Commission."[69] Beyond that, when the Commission announced the General Design Criteria, it took pains to point out that they were only a regulatory beginning and not the end product, and that there would be a fleshing-out of their broad requirements by future regulations more specific in character. Said the Commission:

> The development of these General Design Criteria is not yet complete. For example, some of the definitions need further amplification. Also, some of the specific design requirements for structures, systems, and components important to safety have not as yet been suitably defined.[70]

And the Commission warned "that the criteria will be augmented and changed from time to time as important new requirements for these and other features are developed."[71] The character of the

---

59. Atomic Energy Act § 182(a), 42 U.S.C. § 2232(a) (1970).

60. *See* Power Reactor Dev. Co. v. Electrical Workers Int'l, 367 U.S. 396, 406–416, 81 S.Ct. 1529, 1534–39, 6 L.Ed.2d 924, 931–936 (1961).

61. *Id.*

62. *Id.*

63. Shutdown Petition, *supra* note 3, 36 Fed. Reg. at 23816.

64. See, *e. g.*, 10 C.F.R. §§ 50.35(c), 50.40(a), 50.57(a)(III) (1974).

65. 10 C.F.R. pt. 50, app. A at 288 (1974).

66. *Id.*

67. Interim Policy Statement, *supra* note 15.

68. *Id.* at 12248.

69. 10 C.F.R. pt. 50, app. A at 288 (1974).

70. *Id.*

71. *Id.*

particular standard which germinated the present controversy is clearly denoted by the Commission's reference in the decision under review to "the broad general requirement of Criterion 35." [72]

So it was that, only about five weeks after the effective date of the General Design Criteria,[73] the Commission issued the Interim Acceptance Criteria for emergency core cooling systems and put them into effect immediately. In sharp contrast to the generality of their forerunner, the Acceptance Criteria defined the limits within which emergency core cooling systems must perform in order to supply the "abundant emergency core cooling" required by General Design Criterion 35.[74] In the Commission's words, "[o]n the basis of today's knowledge, the performance of the emergency core-cooling system is judged to be acceptable if the calculated course of the loss-of-coolant accident is limited as" specified in the Acceptance Criteria.[75] And as the Commission stated in the litigation at bar, these criteria "implement the broad general requirement of [General Design] Criterion 35 and provide the basis for judging the acceptability of [emergency core cooling system] performance." [76]

■ The compatibility of the emergency core cooling systems of the challenged reactors with the Interim Acceptance Criteria is not at issue in this case.[77] The question, rather, is whether the Commission's determination of compliance with the Acceptance Criteria is equivalent to a determination of compliance with General Design Criterion 35, and in our view it plainly is. The Acceptance Criteria were projected almost contemporaneously as implementations

of the performance precepts of Criterion 35,[78] and the detailed specifications of the Acceptance Criteria were intended as an effectuation of the generalized requirements of Criterion 35.[79] While Criterion 35 imposes broad requirements calculated to adequately assure safety the Acceptance Criteria particularized that function. Moreover, both were addressed toward satisfaction of the same statutory standard—reasonable assurance of protection to the public health and safety [80]—and both endeavor to vindicate the same public interest, though at differing levels of specificity. We think, then, that a finding that compliance with the Acceptance Criteria provides an effective emergency core cooling system is acceptable as a finding that the system is capable of providing the abundant emergency core cooling demanded by Criterion 35.

We think, too, that the Commission has made the essential findings. When the Acceptance Criteria were announced, the Commission made known its belief "that these criteria for emergency core cooling systems provide reasonable assurance that such systems will be *effective* in the unlikely event of a loss-of-coolant accident." [81] When the shutdown petition was denied, the Commission stated unequivocally that the Acceptance Criteria "implement the broad general requirement of Criterion 35, and provide the basis for judging the acceptability of [emergency core cooling system] performance." [82] The Commission also declared that "as our regulations require, . . . reactors operating under the [Acceptance Criteria] provide reasonable assurance of protection to the public

**72.** Shutdown Petition, *supra* note 3, 36 Fed. Reg. at 23815.

**73.** See text *supra* at notes 15–18.

**74.** See notes 14, 16, *supra*, and accompanying text.

**75.** Acceptance Criteria, *supra* note 7, 36 Fed. Reg. at 12248.

**76.** Shutdown Petition, *supra* note 3, 38 Fed. Reg. at 23815.

**77.** In this court petitioners have not contended that the systems do not comply with the Acceptance Criteria. Indeed, they seemingly have proceeded on the basis that they do.

**78.** See text *supra* at notes 15–20.

**79.** See Part III, *supra*.

**80.** See text *supra* at notes 59–63.

**81.** Acceptance Criteria, *supra* note 7, 36 Fed. Reg. at 12248.

**82.** Shutdown Petition, *supra* note 3.

health and safety in [case of such an] accident," [83] and "that compliance with the [Acceptance Criteria] provides reasonable assurance that emergency core cooling systems will adequately protect the public health and safety." [84] From this, "it follow[ed]" for the Commission "that there is neither . . . an inability to make the required finding of reasonable assurance with respect to the public health and safety, nor any violation of the Commission's regulations.[85]

■ We realize, of course, that none of these pronouncements states in *haec verba* that compliance with the Acceptance Criteria is likewise compliance with Criterion 35. But to say that that particular formulation was necessary is to completely ignore the critical relationship between the two sets of regulations. And in view of their common purpose to execute the statutory mandate of reasonable assurance of adequate protection to the public health and safety,[86] we do not deem the Commission's holding that its regulations were satisfied objectionable simply because it was cast in terms of compliance with the statutory standard.[87]

### IV

■ We are mindful of petitioners' opposition to that conclusion on the ground that some witnesses testifying in the rulemaking proceeding envisioning permanent criteria criticized the Interim Acceptance Criteria and urged more stringent standards. One might, at the outset, question the underlying logic of petitioners' position in that regard. If the Commission must shut down or derate extant reactors when-

ever it hears testimony adverse to their integrity—particularly in a rulemaking proceeding addressed specifically to whether additional safety precautions are needed—it can never progress toward greater safety regulation without calling into question its own performance to date. As the Supreme Court has observed, "nuclear reactors are fast-developing and fast-changing. What is up to date now may not, probably will not, be as acceptable tomorrow." [88] Adoption of petitioners' contention might make a shutdown or derating of many operating reactors well nigh inevitable whenever the agency embarks upon an investigation contemplating higher standards, regardless of the outcome of the investigations.

■ More fundamentally, however, acceptance of petitioners' argument would inexorably draw us into a collateral review of the Acceptance Criteria themselves. That would be our posture although at no time have petitioners participated in any of the proceedings considering standards for emergency core cooling system performance, or sought direct judicial review of any standards promulgated by the Commission on that score.[89] We have long adhered to the view that it is incumbent "upon an interested person to act affirmatively to protect himself" in administrative proceedings,[90] and that "[s]uch a person should not be entitled to sit back and wait until all interested persons who do so act have been heard, and then complain that he has not been properly treated." [91] As we have admonished, "[t]o permit such a person to stand aside and speculate on the outcome; if adversely affected, come

---

**83.** *Id.* at 23816.

**84.** *Id.*

**85.** *Id.*

**86.** See text *supra* at note 80.

**87.** See text *supra* at notes 47–49.

**88.** Power Reactor Dev. Co. v. Electrical Workers Int'l, *supra* note 60, 367 U.S. at 408, 81 S.Ct. at 1535, 6 L.Ed.2d at 932. *See also* Crowther v. Seaborg, 312 F.Supp. 1205, 1234 (D.Colo.1970).

**89.** See text *supra* at note 26.

**90.** Red River Broadcasting Co. v. FCC, 69 App. D.C. 1, 5, 98 F.2d 282, 286, cert. denied, 305 U.S. 625, 59 S.Ct. 86, 83 L.Ed. 400 (1938). See also cases cited *infra* note 91.

**91.** *Id. See also* Easton Utils. Comm'n v. AEC, 137 U.S.App.D.C. 359, 363, 424 F.2d 847, 851 (*en banc* 1970); Spanish Int'l Broadcasting Co. v. FCC, 128 U.S.App.D.C. 93, 105, 385 F.2d 615, 627 (1967).

into this court for relief; and then permit the whole matter to be reopened in his behalf, would create an impossible situation."[92] Much more recently, we have also held that those who refrain from participation in rulemaking proceedings may not obtain direct judicial review of the regulations resulting.[93] The incongruity of reexamining such regulations is apparent when, as here, the would-be occasion is judicial review of an administrative proceeding which itself involved a collateral attack upon them.[94]

■ These difficulties are compounded by another factor prominent in the case at bar. The shutdown petition sought emergency relief of a drastic nature pending reconsideration of the Interim Acceptance Criteria in the rulemaking proceeding in progress. In that milieu, and upon consideration of the administrative record, the Commission perceived no "factual basis which would warrant short-circuiting the orderly culmination of the [ongoing] rulemaking proceeding."[95] We ourselves believe that "[i]t is particularly appropriate to defer to [agency] discretion when the question at issue is a matter of interim relief, as it is in this case."[96] And we adhere to the proposition that "[w]here the agency weighs the risks and withholds emergency relief while conducting further study into the matters at issue, its judgment will be sustained if it 'appears from the whole case and the rea-

sons stated that the [agency] action is supported by reason.'"[97]

■ We readily find that support in the administrative record here.[98] The vast majority of the witnesses testified that continued use of the Interim Acceptance Criteria would afford reasonable assurance of protection to the health and safety of the public. The Commission's regulatory staff proposed some changes, but nonetheless gave general support to the Acceptance Criteria for interim use. Unqualified support for those criteria was also forthcoming from the Advisory Committee on Reactor Safeguards,[99] from Commission consultants, and from other experts in the scientific and engineering disciplines relevant to emergency core cooling system analysis. Surely, with this substantial body of expert opinion favoring reliance on the Acceptance Criteria—pending the Commission's decision on long-term requirements for emergency core cooling systems in the nearly concluded rulemaking proceeding—we cannot say that the Commission acted arbitrarily or irrationally.[100]

In sum, we have no reason to disturb the Commission's conclusion that the emergency core cooling systems under attack met the Interim Acceptance Criteria.[101] We have no cause to doubt that in meeting them the systems met the test of effectiveness under General Design Criterion 35. Like the Supreme Court in *Power Reactor*,[102] "[w]e see no

**92.** Red River Broadcasting Co. v. FCC, *supra* note 90, 69 App.D.C. at 5–6, 98 F.2d at 286–287.

**93.** Gage v. AEC, 156 U.S.App.D.C. 231, 479 F.2d 1214 (1973).

**94.** The Commission found that "the instant petition plainly makes no showing of good cause for petitioners' belated participation in the [emergency core cooling system] proceeding." Shutdown Petition, *supra* note 3, 38 Fed.Reg. at 23816 n. 4.

**95.** *Id.* at 23816.

**96.** Wellford v. Ruckelshaus, 142 U.S.App.D.C. 88, 91, 439 F.2d 598, 601 (1971).

**97.** Friends of Earth v. AEC, 158 U.S.App.D.C. 252, 255, 485 F.2d 1031, 1034 (1973), quoting Nader v. FAA, 142 U.S.App.D.C. 264, 266, 440

F.2d 292, 294 (1971) (statement of Leventhal, J.). This standard of review is all the more fitting when "[w]e are not being asked to enjoin a Commission action, but to mandamus one." *Id.*

**98.** See note 36, *supra*.

**99.** The Advisory Committee on Nuclear Reactor Safeguards is a body of nongovernmental experts convened for the purpose of advising the Commission on "the hazards of proposed or existing reactor facilities and the adequacy of proposed reactor safety standards." Atomic Energy Act § 5, 42 U.S.C. § 2039 (1970).

**100.** See text *supra* at notes 50–55.

**101.** See text *supra* at notes 44–49.

**102.** *Supra* note 60.

reason why we should not accord to the Commission's interpretation of its own regulation . . . that respect which is customarily given to a practical administrative construction of a disputed provision." [103] We sustain, then, the Commission's finding that the emergency core cooling systems in question conform to the Acceptance Criteria as a sufficient finding of conformance with Criterion 35.[104]

Petition dismissed.

**103.** 367 U.S. at 408, 81 S.Ct. at 1536, 6 L.Ed.2d at 932.

**104.** For the reasons expressed herein, we also deny petitioners' request to remand this case to the Commission for further consideration as to whether the impugned reactors comply with General Design Criterion 35.