**AMERICAN TRADING TRANSPORTATION COMPANY, Plaintiff,**

v.

**UNITED STATES of America, et al., Defendants.**

**ATLANTIC RICHFIELD COMPANY, Plaintiff,**

v.

**UNITED STATES of America, et al., Defendants.**

**Civ. A. Nos. 84–3409, 84–3536.**

United States District Court, District of Columbia.

March 29, 1985.

[redacted]

Richard H. Saltsman, Bowman, Conner, Touhey & Petrillo, Washington, D.C., for defendants-intervenors Archon Shipping, Inc. and American Petrofina, Inc.

William E. McDaniels, Kevin T. Baine, Williams & Connolly, Washington, D.C., for defendant-intervenor Seatrain Lines.

Jonathan Blank, John W. Angus, III, Preston, Thorgrimson, Ellis & Holman, Washington, D.C., for defendants-intervenors Seatrain Lines, Inc. and Boston VLCC Tankers, Inc., VI.

## MEMORANDUM

HAROLD H. GREENE, District Judge.

At issue in these cases is the application of section 506 of the Merchant Marine Act of 1936, 46 U.S.C. § 1156. Plaintiffs in the *American Trading* case, owners of American flag ships built without subsidy which operate in the domestic trade, brought suit to invalidate a decision of the Maritime Administration (Marad) to permit two subsidized American vessels to operate in that trade.[1] The owners of the subsidized vessels were permitted to intervene as defendants. The related *Atlantic Richfield* action challenges Marad's decision not to permit that company's vessel, the "Arco Spirit," to enter the domestic trade. American Trading Transportation Company, Seatrain, and Boston VLCC were permitted to intervene in that action.

Jeffrey R. Masi, Anne E. Mickey, Linda L. Martin, Bogle & Gates, Washington, D.C., for plaintiffs American Trading Transp. Co., Inc., et al.

John H.E. Bayly, Asst. U.S. Atty., Washington, D.C., for federal defendants.

James F. Ford, Timothy B. Shea, Maritime Admin., U.S. Department of Transp., Washington, D.C., of counsel.

Mark P. Schlefer, Michael Joseph, Kominers, Fort, Schlefer & Boyer, Washington, D.C., for plaintiffs Atlantic Richfield Co.

On November 9, 1984, this Court denied American Trading's motion for a temporary restraining order, and the matter is now before the Court on motions for preliminary injunction filed both by American Trading and by Arco.

██ It is clear—and all parties agree—that these cases involve a review of agency decisions and rulemaking, and that this Court's responsibility is therefore limited to a determination of whether Marad's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accord-

---

1. Marad permitted the "Brooklyn," chartered by Archon and American Petrofina and the "Maryland," owned by Boston VLCC Tankers, Inc. VI, and chartered by Seatrain, Inc., to enter the domestic trade for six-month periods beginning on December 15, 1984 and November 15, 1984, respectively.

ance with law. 5 U.S.C. § 706(2)(A); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The limited scope of judicial review in these cases, the substantial record before the Court, and the fact that there has been voluminous briefing and two oral arguments in these cases, makes it possible for the Court to dispose of them upon the merits.[2]

## I

It is the purpose of the Merchant Marine Act to foster the development and maintenance of the United States' merchant marine.[3] One of the methods employed to accomplish this objective has been the development of two separate fleets—one to compete in the foreign trade and the other to operate in the domestic trade. Assistance is provided to vessels built in American shipyards which are destined for operation in the foreign trade in the form of construction-differential subsidies (CDS). However, in order to prevent the subsi-

dized fleet from unfairly competing against unsubsidized vessels, the former are prohibited, as a general matter, from operating in the domestic trade.

■ The Secretary of Transportation has authority to permit subsidized vessels to enter the domestic market after full repayment of their CDS,[4] or upon grant of a waiver for up to six months per year with pro rata repayment of the CDS.[5] The Secretary's decision under this scheme is a "highly discretionary" one (*Seatrain Shipbuilding Corp. v. Shell Oil Co., supra,* 444 U.S. at 589, 100 S.Ct. at 810), and it requires a balancing of a number of factors. Indeed, while the Secretary must consider the impact of a waiver upon the unsubsidized fleet (*Shell Oil Co. v. Kreps,* 445 F.Supp. 1128 (D.D.C.1977)) that is not the sole determinative factor: the Act permits a waiver to be granted whenever "necessary or appropriate to carry out the purposes of the Act"—and those purposes are very broad.[6]

**2.** In general, courts will not consolidate a decision on a preliminary injunction with a decision on the merits without a separate trial. In this case, it is clear that all relevant evidence is before the Court, and that no prejudice will result from a decision on the merits. See generally, 11 Wright & Miller, *Federal Practice and Procedure* § 2950. Indeed, in the *Atlantic Richfield* case, plaintiff specifically suggested that the Court dispose of the case on the merits. Plaintiff's Reply Memorandum in Support of Motion for Preliminary Injunction at 7.

**3.** 46 U.S.C. § 1101 provides:

It is necessary for the national defense and development of its foreign and domestic commerce that the United States shall have a merchant marine (a) sufficient to carry its domestic water-borne commerce and a substantial portion of the water-borne export and import foreign commerce of the United States and to provide shipping service essential for maintaining the flow of such domestic and foreign water-borne commerce at all times, (b) capable of serving as a naval and military auxiliary in time of war or national emergency, (c) owned and operated under the United States flag by citizens of the United States, insofar as may be practicable, (d) composed of the best-equipped, safest, and most suitable types of vessels, constructed in the United States and manned with a trained and efficient citizen personnel, and (e) supplemented by efficient facilities for shipbuilding and ship

repair. It is declared to be the policy of the United States to foster the development and encourage the maintenance of such a merchant marine.

**4.** *Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. 572, 100 S.Ct. 800, 63 L.Ed.2d 36 (1980).

**5.** The Merchant Marine Act provides that subsidy-constructed vessels are limited to the foreign trade unless "[t]he Secretary ... consent[s] in writing to the temporary transfer of such vessel to service other than [foreign service] for periods not exceeding six months in any year, whenever the Secretary may determine that such transfer is necessary or appropriate to carry out the purposes of this Chapter." 46 U.S.C. § 1156.

**6.** The basic purpose of the Act is to ensure a merchant marine "composed of the best-equipped, safest, and most suitable types of vessels, constructed in the United States and manned with a trained and efficient citizen personnel" and supplemented by domestic shipbuilding facilities. 46 U.S.C. § 1101. Accordingly, the Secretary is responsible for guaranteeing the overall well-being of the American merchant marine, including supervision of the CDS program and of the ship financing guarantee program (46 U.S.C § 1271–1279c), a responsibility which is not limited to the protection of unsubsidized vessels in the domestic trade.

## II

In September 1984, three subsidized vessels, the "Brooklyn," the "Maryland," and the "Arco Spirit" applied to Marad for permission to enter the domestic trade to carry crude oil from Valdez, Alaska to the Panama Canal. All three vessels are Very Large Crude Carriers (VLCCs) over 100,000 deadweight tons (dwt) in size. On October 3, 1984, notice of the applications was published in the Federal Register, and comments were solicited, 49 Fed.Reg. 39143–44 (1984). Fourteen interested parties filed comments, and the applicants were given an opportunity to respond. On October 19, 1984, the Administrator extended the comment period to permit parties to comment on a potentially relevant court decision, *Atlantic Richfield Co. v. United States,* Civil Action No. 84–0139 (D.D.C. October 12, 1984), and the protestors filed additional comments and the applicants responded accordingly. Following the receipt of these comments, Marad denied requests for the filing of additional comments (see *infra*), and on November 7, 1984, it issued a brief order granting waivers to the "Brooklyn" and the "Maryland" but denying the "Arco Spirit" application. On November 16, 1984, the agency issued an opinion explaining in detail the reasons for the November 7 order.

Marad's decision has been challenged by plaintiffs in both cases as being arbitrary, capricious, and an abuse of discretion. More specifically, American Trading challenges both the instant waiver proceeding and the propriety of the underlying regulation, while Arco challenges the authority of Marad to grant a waiver to some vessels but to deny it to others.

## III

On June 29, 1977, Marad published a final rule setting forth eligibility and other requirements for the carriage of Alaskan oil in the domestic trade by tank vessels which were built with CDS. 42 Fed.Reg.

33035 (June 29, 1977). According to the regulation, it has as its purpose the satisfaction of carriage requirements for Alaskan oil in the domestic trade after utilization of suitable vessels built without the benefit of CDS. The regulation is essentially procedural, that is, it does not list the factors which the Secretary will consider in making a determination under section 506. It does, however, contain one relevant substantive determination [7]—that only vessels of over 100,000 dwt will be regarded as suitable for the Alaska-Panama Canal trade. The effect of this regulation, which is critical here, is as follows. A "suitable" subsidized vessel, *i.e.,* one larger than 100,000 dwt, may apply for a waiver to enter this trade, and a "suitable" unsubsidized vessel has the power to protest and block the issuance of a waiver. However, a vessel not meeting the 100,000 dwt threshold is able to do neither. See 46 C.F.R. 250.

In the seven years in which the regulation has been in effect, Marad has issued at least 15 decisions pursuant thereto, repeatedly stating that protests of vessels under 100,000 dwt would not be permitted to block the grant of waivers, and upholding its earlier determination that smaller vessels are not "suitable" for the trade. See, *e.g.,* Dockets S–741 to 743 Arco Transportation Co., MA October 7, 1983, at 15.

Plaintiffs in the *American Trading* case own or operate unsubsidized vessels which fall short of the 100,000 dwt limitation, and accordingly, when they protested the application of other vessels to enter the domestic trade, Marad did not consider their views. In this proceeding, these plaintiffs have presented two separate challenges to the regulation as well as numerous challenges to the waiver determination made in favor of the "Brooklyn" and the "Maryland." The Court first considers the challenges to the regulation.

■ First. Plaintiffs claim that the regulation violates the Administrative Proce-

---

**7.** Additionally, of the three segments of the Alaska oil trade—Alaska-West Coast trade, Alaska-Panama Canal trade, and Panama Canal-Atlantic/Gulf Coast trade—the regulation is limited to the Alaska-Panama Canal trade.

dure Act (5 U.S.C. § 553) by its failure to include a concise statement explaining the basis for the choice of 100,000 dwt as the size of a suitable vessel. While the APA requirement that rules shall incorporate a concise statement of basis and purpose is an important tool for ensuring reasoned regulations,[8] the agency's failure to comply—assuming *arguendo* that the regulation is inadequate in that regard—does not help these plaintiffs. Plaintiffs have waited seven years to challenge the regulation. Several of the plaintiffs, which were in existence and in the shipping business at the time, did not submit comments or otherwise participate in the rulemaking process. The one plaintiff which did participate, ITOC, specifically proposed the definition of "suitable vessel" which it seeks to challenge here. Under these circumstances, plaintiffs cannot now challenge the rule. *National Resources Defense Council v. Nuclear Regulatory Commission,* 666 F.2d 595, 602 (D.C.Cir.1981); *Nader v. Nuclear Regulatory Commission,* 513 F.2d 1045, 1054–55 (D.C.Cir.1975).[9]

■ Second. Similar considerations serve to undermine plaintiff's other challenge to the regulation. Plaintiffs claim that because the regulation does not permit vessels of less than 100,000 dwt to block the issuance of a waiver, it fails to consider competitive effect and is thus inconsistent with the law. See *Shell Oil Company v. Kreps, supra,* 445 F.Supp. 1128. However, plaintiffs do not rely on the competitive conditions as they existed when the regulation was adopted; rather, they assert that "since the promulgation of 46 C.F.R. Part 250, the supply of and demand for tanker tonnage in the domestic trades have funda-

mentally changed," and that for that reason it violates the statutory command. Plaintiff's Memorandum at 32.

If, in fact, it is true that market conditions have so changed as to alter the competitive effect rationale of the regulation, the proper procedure would have been to petition the agency for a new rulemaking rather than to institute a court challenge to the validity of the existing regulation. A new rulemaking would permit all interested parties to present their views, and it would also permit the agency to utilize its recognized expertise in adopting the proper rule. Certainly, consistently with proper administrative practice, Marad should be given the opportunity to make the initial determination of whether conditions have changed to the extent that the current rule no longer adequately considers the interests of the domestic fleet; the Court cannot make that decision *ab initio.*

■ In any event, the Court could not find that plaintiffs have shown the limitation imposed by the Secretary to be arbitrary, capricious, or an abuse of discretion.[10] Marad has determined that VLCCs "are the most economical for operation from the standpoint of the shipper," that they enjoy economies of scale; and that "small ships could not be considered to be competitive with the VLCCs in the Alaska/Panama trade and that it would be unfair to both the charters and the ultimate consumer to require the charter of all available small vessels, even though they are unsuitable for the trade." Marad Opinion at 52–54. Those determinations are at a minimum rational conclusions in furtherance of the statutory objective of the main-

---

**8.** *Independent U.S. Tankers Owners Committee (ITOC) v. Lewis,* 690 F.2d 908, 918 (D.C.Cir. 1982).

**9.** Furthermore, where, as here, the industry appears to have negotiated the regulations with the agency and the classifications are apparently obvious to entities in the trade (see, *e.g.,* Memorandum of Seatrain Lines in Opposition to Plaintiff's Motion at 28–29; ITOC Comments on Proposed Rule), a court would not be justified in striking the agency rule seven years later because of the lack of an adequate statement of

basis. *Alabama Ass'n of Ins. Agents v. Board of Governors,* 533 F.2d 224, 236 (5th Cir.1976), *vacated in part,* 558 F.2d 729 (5th Cir.1977).

**10.** The agency construction of a statute is of course entitled to deference unless there are compelling indications that it is wrong. *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *Lead Industries Ass'n v. Environmental Protection Agency,* 647 F.2d 1130, 1147 (D.C.Cir.1980).

tenance of a merchant marine "composed of the best-equipped, safest, and most suitable types of vessels." 46 U.S.C. § 1101.[11]

For these reasons, the Court rejects the claim that the Secretary's refusal to permit smaller vessels to block waivers for subsidized VLCCs is arbitrary or capricious or that it reflects a disregard of the requirements of the law.

## IV

Plaintiffs also argue that the rulemaking procedure which resulted in the grant of these waivers denied them due process because Marad refused to allow a third round of comments after plaintiffs submitted allegedly new information relating to Marad's financial interest in Seatrain[12] and thus of bias, prejudice, and precommitment.

■ It is true, of course, that Marad has a substantial financial stake in Seatrain, and that ordinarily a decision-maker should be free of·an economic stake in the decision. But the curious mixture of financial interest and decision-making that is present here was established by the Congress in the Merchant Marine Act and is thus not open to question by the Court. Indeed, the Supreme Court itself has recognized that, in view of this congressional directive, Marad is entitled to take into consideration "the Government's position as guarantor of substantial financial obligations." *Seatrain Shipbuilding Corp. v. Shell Oil Co.,* supra, 444 U.S. at 588, 100 S.Ct. at 809.

As for plaintiffs' specific claim of denial of due process because of the refusal of Marad to reopen the proceedings, it would have merit only if the relationship between Marad and Seatrain and Seatrain's financial difficulties constituted newly-discovered, hitherto unknown facts—something they clearly were not. Everyone in the industry has been aware of this relationship and of the Seatrain reorganization for as long as these factors have existed,[13] and it is simply disingenuous of the *American Trading* plaintiffs to assert that they represented a new issue deserving of yet another round of briefing.

In short, nothing "new" was raised by the comments which plaintiff proposed to submit, and it certainly was not an abuse of discretion for the agency to refuse to extend the comment period after this stale issue was raised at a late stage of the proceedings.

Finally, the Administrator has explicitly stated that the financial issues raised by the applications were not necessary for its final decision and that "the argument was not considered; rather the policy was continued by evaluating the applications apart from the applicant's financial ability to make Title XI payments." Marad Opinion at 47. That statement—that the applications met the standards for waivers without the necessity for consideration of the financial implications to the United States—is entirely credible,[14] if only be-

---

**11.** Marad has also determined that smaller vessels carry a very small proportion of the Alaskan-Panama trade, whether or not CDS vessels are in the market (Marad Opinion at 56), further buttressing the conclusion that these vessels are not suitable for the trade.

**12.** As noted above, Seatrain is the charterer of the "Maryland." Marad, through the CDS program, has an interest in the Seatrain group which plaintiffs estimate at $200–$300 million. Seatrain is currently in reorganization under Chapter 11 of the Bankruptcy Code and its ability to repay its obligations to the U.S. government clearly depends upon the success of the reorganization. See Response of Boston VLCC VI, Inc., Administrative Record at 81.

**13.** The specific issue arose formally in this proceeding when Bulkfleet Marine, owner and operator of unsubsidized vessels, stated in its comments that the grant of the waivers "may cause defaults of government guaranteed financing programs such as Title XI by rippling displacement." Bulkfleet's Comments, Administrative Record at 65. In response, Boston VLCC noted the potential economic injury to the United States (or Marad) if the waivers were not granted because of the detrimental effect this would have on the Seatrain reorganization and that company's ability to repay its obligations. Response of Boston VLCC, Inc., Administrative Record at 81.

**14.** The agency's financial interests extend to both the subsidized and unsubsidized portions

cause the record fully supports the agency's conclusion that there was a need for additional VLCCs in the trade and that "suitable" unsubsidized vessels were not available to block the waivers. Accordingly, there was no denial of due process.

## V

■ Atlantic Richfield claims in Civil Action No. 84–3536 that its application for a waiver with respect to one of its vessels was denied on an unreasonable and discriminatory basis. It is true, and the record shows, that waivers were granted for two vessels owned by Arco's competitors, and that Arco's own waiver application was denied, but this does not, without more, demonstrate unconstitutional discrimination.

It is Arco's position that once Marad had concluded that the trade needed vessels in addition to the unsubsidized ones already operating, it was required to allow any CDS vessel wishing to do so to operate in that trade, and that, by denying one application at the same time that others were granted, the agency unlawfully discriminated against Arco in violation of the Equal Protection Clause.[15] That argument lacks merit.

To begin with, the record supports Marad's determination that "a present need for two CDS VLCC tankers is evident" (Marad Opinion at 58), and that determination is not seriously challenged.[16] Arco does claim, however, that it is beyond Marad's jurisdiction to decide which two VLCCs should be granted waivers, and that, to the

contrary, it must permit all CDS vessels to enter the trade and thus to permit the market to decide which two will remain.

This view is not consistent with the statutory framework which establishes a case-by-case, discretionary waiver system. See note 5, *supra*. If the Arco approach were the one intended by the Congress, the Secretary would not have been given the power to consider applications and to grant waivers. Instead, the procedure would have been for the Secretary simply to certify a need for CDS vessels in the domestic trade, and then any and all CDS vessels would automatically have the right to compete in that trade for six months. That, as indicated above, is plainly not the approach intended by Congress.

Arco's view that the sole legitimate consideration in the granting of waivers is the protection of non-CDS vessels also represents an overly narrow view of the statutory language. As noted *supra*, the statute permits the grant of waivers when "necessary or appropriate to carry out the purposes of the Act." While protection of the unsubsidized fleet is one of the principal purposes of the Act, Marad may also consider, consistently with the statutory purposes, how the waiver system will ensure efficient and economic utilization of the CDS vessels needed in the domestic trade. For these reasons, the Court concludes that a determination to grant waivers only to the number of vessels for which there is a present need does not violate the statutory intent.

Arco also claims that the determination to grant waivers to the "Brooklyn" and the

of the fleet, a fact likewise well known in the industry. *Seatrain Shipbuilding Corp. v. Shell Oil Co., supra; ITOC v. Lewis,* 690 F.2d 908 (D.C.Cir.1982).

**15.** Equal protection is denied when there is unlawful discrimination in the administration of an otherwise neutral law. *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). However, plaintiff does not allege that it was excluded because of prejudice or any intentional or purposeful discrimination. Its sole claim is that the Administrator is precluded from making a rational distinction under the statute to grant certain vessels waivers while denying others.

**16.** A need was anticipated for an additional VLCC in February. This does not mean, as Arco seems to imply, that Marad had to grant three six-month waivers beginning in November or December because there might be a future need for a third vessel. The Administrator could find that a need for only two CDS vessels existed in November, and he could defer any decision as to the need for CDS vessels for February. The Marad opinion specifically notes that "[d]enial of Arco's application is without prejudice to its reapplying at any time." Marad Opinion at 60.

"Maryland" but not the "Arco Spirit" was irrational or capricious. Four reasons were given by Marad for the denial of the "Arco Spirit" application. These are: "(1) of the three applicants it has most recently had gainful employment, (2) its vessel is least in position to meet the loading schedule established by Exxon, (3) its application is the most uncertain regarding anticipated employment of the vessel, and (4) dividing the time period between applicants would be disruptive to the trade and expensive in terms of positioning costs." Marad Opinion at 60.

Arco is correct in noting that the fourth reason does not support a distinction between the "Arco Spirit" and the other two applicants.[17] However, the other three reasons clearly provide a rational basis upon which the Secretary could make a distinction between the "Arco Spirit" and the other two vessels,[18] and the Atlantic Richfield challenge to the Marad decision therefore must also fail.

For these reasons, the Court will grant judgment to the defendants and dismiss the complaints.

---

**17.** It does, however, support the Secretary's determination that only two vessels should be permitted to enter the trade.

**18.** It is undisputed, for example, that of the three vessels, the "Arco Spirit" was the most recently employed. Furthermore, Atlantic Richfield concedes in its reply memorandum that its vessel would not have been able to meet the November 15 loading deadline. Arco Reply at 5.