## NORTH ANNA ENVIRONMENTAL COALITION, Petitioner,

v.

## UNITED STATES NUCLEAR REGULATORY COMMISSION and United States of America, Respondents,

### Commonwealth of Virginia, Virginia Electric and Power Company, Intervenors.

No. 75–1312.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 20, 1975.

Decided March 3, 1976.

Rehearing Denied May 7, 1976.

William H. Rodgers, Jr., Washington, D. C., for petitioner.

James A. Fitzgerald, Atty., with whom Wallace H. Johnson, Asst. Atty. Gen., Peter L. Strauss, Gen. Counsel, Stephen F. Eilperin, Asst. Gen. Counsel, U. S. Nuclear Regulatory Commission, and Edmund B. Clark, Atty., Dept. of Justice, Washington, D. C., were on the brief for respondents.

James E. Ryan, Jr., Richmond, Va., for intervenor Com. of Virginia. Frederick S. Fisher, Asst. Atty. Gen., Richmond, Va., also entered an appearance for intervenor Com. of Virginia.

Michael W. Maupin, Richmond, Va., with whom James N. Christman, Richmond, Va., was on the brief for intervenor Virginia Electric & Power Co.

Before DANAHER, Senior Circuit Judge, WILKEY, Circuit Judge, and VAN PELT,* United States Senior District Judge for the District of Nebraska.

Opinion for the Court filed by Senior District Judge VAN PELT.

VAN PELT, Senior District Judge:

This case is before this court upon a petition for review of a decision of the Atomic Safety and Licensing Appeal Board which affirmed an Atomic Safety and Licensing Board decision granting a license for the construction of and holding that the location of a four unit nuclear power plant facility on the proposed North Anna, Virginia, site was consistent with public health and safety. Petitioner, North Anna Environmental Coalition, which was an intervenor before the Board, is a citizens and environmental organization. Respondent is the United States Nuclear Regulatory Commission, formerly called the Atomic Energy Commission. Both are referred to herein as the Commission. The Virginia Electric and Power Co. (VEPCO) and the State of Virginia were also intervenors before the Board and made an appearance in this court.

This litigation had its beginning in 1971 when the Commission issued two Construction Permits, CPPR–77 and CPPR–78, whereby VEPCO began construction of units one and two of what was to be a four unit nuclear power reactor generating station, to be known as North Anna Power Station. The site evaluations for units one and two had originally been made in 1968. The station is located on a 1075 acre tract in Louisa County, Virginia, and, as the name implies, it is in the area of the North Anna River. The North Anna site is located in the Appalachian Piedmont Geologic Province.

Construction began on units one and two and VEPCO then applied for construction permits for the two additional nuclear reactors at the same site. Hearings were had in May, 1973. Before the permits for units three and four were granted and during

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

excavation for units one and two a fault was discovered.[1] The Commission [2] then issued a show cause order to suspend all work pending an investigation and study. This show cause order and the hearing thereon resulted in the decisions now before the court.

The Commission held a hearing which lasted twelve days and which produced 2593 pages of testimony and 74 exhibits. All parties to this case above enumerated participated as did representatives of the U. S. Geological Survey (USGS), which was the Commission's advisor on seismic and geologic matters. By stipulation of the parties, the hearing concentrated principally on the safety of the site and the adequacy of the reactor design in light of the discovery of the fault zone. The stipulated issues involved interpretation of Section 103(d) of the Atomic Energy Act of 1954, 42 U.S.C. § 2133(d) (1970) and of 10 C.F.R. Pt. 100, App. A, (1975).[3]

The Licensing Board determined and the Appeal Board affirmed that there was reasonable assurance that the fault under the North Anna site was not "capable" within the meaning of the regulations and the creation of a lake (Lake Anna) did not threaten to reactivate the fault. A finding of "incapability" was found to mean that the site was as stable as one without a fault and therefore it was determined that the presence of the fault did not require changes in design specifications for units one and two and also that the fault had no bearing on approval of the construction permits for units three and four.

The Board also determined that permits for construction of units three and four

should be issued and that while the construction permits for units one and two were issued prior to full implementation of the National Environmental Policy Act by the Commission, the environmental values will be adequately protected by adding certain enumerated conditions.

The issues presented on this appeal, using petitioner's language almost verbatim, are:

1. Whether the siting of a nuclear power plant directly astride a fault creates additional risks, above and beyond those normally associated with reactor siting, that are inimical to the health and safety of the public.

2. Whether the power plant, sited in the circumstances of this case, has earthquake design assumptions of sufficient conservatism to satisfy statutory and administrative standards.

3. Whether it is required that the absence of macroseismicity directly related to the fault be proven by instrumental determination.

4. Whether the Appeal Board erred in concluding that the fault at the site was proven not to be structurally related to a capable fault.

5. Whether the "reasonable assurance of safety" test, established by Commission regulations, requires the applicant to prove beyond a reasonable doubt that the North Anna fault is not capable.

This petition for review raises issues of first impression regarding the siting of a nuclear power reactor on a fault zone. In doing so it presents for review actions of an agency whose "regulatory scheme . . . is virtually unique in the degree to which

---

1. The record would support a finding that it was not until May 14, 1973, at a meeting attended by Dr. Donald U. Wise, professor of geology at the University of Massachusetts, and others, that the geologists concluded that the fracture which was not a clean break, was really a fault. Joint Appendix 204.

2. At the time of the show cause order and hearing the Commission involved was the Atomic Energy Commission. The licensing and related regulatory functions were transferred to the Nuclear Regulatory Commission by the Energy Reorganization Act of 1974, Pub.L. 93–

438, § 201(f), 88 Stat. 1233, 1243, codified at 42 U.S.C.A. § 5841(f) (Supp. I 1975).

3. A second stipulation of the parties resulted in separating issues involving the adequacy of VEPCO disclosures regarding the fault. This matter was the subject of a separate hearing. The Licensing Board in September, 1975 determined that several false statements had been made and imposed a civil monetary penalty of $60,000 on VEPCO. VEPCO has taken exception to these findings.

broad responsibility is reposed in the administrative agency, free of close prescription in its charter as to how it shall proceed in achieving the statutory objectives." *Siegel v. Atomic Energy Comm'n,* 130 U.S.App.D.C. 307, 312, 400 F.2d 778, 783 (1968). As precondition to the issuance of a license for operation of a nuclear facility, the Atomic Energy Act of 1954, 42 U.S.C. § 2011 et seq. requires a finding by the agency that the proposed facility will provide "adequate protection to the health and safety of the public." 42 U.S.C. § 2232(a) (1970). If issuance would be "inimical" to the health and safety of the public, a license must be denied. 42 U.S.C. § 2133(d) (1970). The demand for this type of protection has consistently been construed by the Commission as a demand for "reasonable assurance" that such protections are present, and this interpretation has been upheld by the Supreme Court. *Power Reactor Dev. Co. v. International Union of Electrical, Radio and Machine Workers,* 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961); *Nader v. Nuclear Regulatory Comm'n,* 168 U.S.App.D.C. 255, 262, 513 F.2d 1045, 1052 (1975).

It follows that this is a first-time review of the agency's interpretation of its own recently enacted regulations.

Guidelines for such review are already established. Nearly fifteen years ago the U. S. Supreme Court in *Power Reactor Dev. Co. v. International Union of Electrical, Radio and Machine Workers, supra,* 367 U.S., at 408, 81 S.Ct. at 1535, 6 L.Ed.2d at 932, stated:

> "We see no reason why we should not accord to the Commission's interpretation of its own regulation and governing statute that respect which is customarily given to a practical administrative construction of a disputed provision. Particularly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new.' . . . ."

Speaking for this court in a case involving an order of the Atomic Energy Commission, Judge McGowan said in *Union of Concerned Scientists v. Atomic Energy Comm'n,* 163 U.S.App.D.C. 64, 85, 499 F.2d 1069, 1090:

> "The AEC has chosen to employ a most conservative (drastic) assumption in determining site suitability because site selection is the most critical decision."

The Commission's reactor site criteria are found as Part 100 of Title 10, Code of Federal Regulations relating to the Atomic Energy Commission. Their purpose is stated:

> " . . . to describe criteria which guide the Commission in its evaluation of the suitability of proposed sites. . . " *Id.,* § 100.1(a)

Very frankly, it states:

> "Insufficient experience has been accumulated to permit the writing of detailed standards that would provide a quantitative correlation of all factors significant to the question of acceptability of reactor sites. This part is intended as an interim guide to identify a number of factors considered by the Commission in the evaluation of reactor sites and the general criteria used at this time as guides in approving or disapproving proposed sites." *Id.,* § 100.1(b).

This lack of experience is further emphasized in Section 100.2(b):

> "In the application of these criteria *which are deliberately flexible,* the safeguards provided—either site isolation or engineered features—should reflect the lack of certainty that only experience can provide." [Emphasis added].

Section 100.10 deals with factors to be considered when evaluating sites, including not only characteristics of reactor design but also population density and use characteristics of the site environs and physical characteristics of the site, including seismology, meteorology, geology, and hydrology.

The review in this case involves only the physical characteristics and particularly seismology and geology.

Appendix A to Part 100 is devoted to Seismic and Geologic Siting Criteria for Nuclear Power Plants. It requires that nuclear power plant structures, systems and components important to safety be designed to withstand the effects of natural phenomena such as earthquakes, without loss of capability to perform their safety functions.

"These criteria, which apply to nuclear power plants, describe the nature of the investigations required to obtain the geologic and seismic data necessary to determine site suitability and provide reasonable assurance that a nuclear power plant can be constructed and operated at the proposed site without undue risk to the health and safety of the public." Appendix A, § II.

Much of the testimony before the Board related to a study of saprolite found at the site between the soil and the underlying granitic gneiss. The Appeal Board determined:

"Saprolite is a fragile material formed by the weathering of sedimentary rock. At the North Anna site, saprolite had formed both from the deep bedrock and from the breccia, or rock fragments, in the fault itself. Any movement of the fault after saprolite formation would have damaged the saprolite. Extensive examination of the saprolite, including microscopic analysis, revealed no such damage, thus indicating that the fault had not moved since the saprolite had formed. Using the most conservative approach for dating the saprolite, it is clear that the part of the saprolite examined must have been created more than 500,000 years ago. (Under less conservative but perhaps more accurate approaches, the age of the saprolite was estimated as being between 600,000 and 2,000,000 years.)

We need not rehearse here the Licensing Board's reasons for concluding that the second and third characteristics of a capable fault were not present (see RAI–74–6 at 1206–08). It suffices to note that, although the saprolite study serves directly to negate the presence of only the first of those characteristics (involving the recency of movement relative to the fault), it at least indirectly reinforces the conclusion of the Licensing Board that the other two characteristics are likewise absent.

For example, a fault will be deemed capable, under the second criterion, if it has exhibited 'macroseismicity instrumentally determined with records of sufficient precision to demonstrate a direct relationship with the fault.' There is some dispute between the parties as to what result should ordinarily be reached if an adequate macroseismic monitoring network has not been in place for a sufficient time. We need not pass upon that question here, however, for the presence of the undisturbed saprolite establishes that any macroseismicity that may have been felt at the site could not have been as a result of movement across the fault. Thus, in the words of the regulation, it could not have had a 'direct relationship with the fault.' " [The original footnotes are not quoted herein.]

It is not possible to briefly summarize all of the evidence at the hearing and contained in the many volumes of the printed transcript. Suffice it to say that having read the record we conclude the evidence has been accurately set forth in the decision of the Board and in the separate decision of the Appeal Board. We will set forth only portions needed in our discussion.

There are two types of investigation required by Appendix A. The first is to obtain information needed to determine the "quantitative vibratory ground motion design basis at a site due to earthquakes," Appendix A, § II, or the motion produced by the Safe Shutdown Earthquake.[4] The

---

4. Safe Shutdown Earthquake is:
"that earthquake which is based upon an evaluation of the maximum earthquake po-

tential considering the regional and local geology and seismology and specific characteristics of local subsurface material. It is that

second is to determine to what extent a nuclear power plant need be designed to withstand the effects of surface faulting.[5] Investigation of faults,[6] any part of which is within 200 miles of the site, is an important step in the geologic and seismic evaluation of a proposed site, the most critical determination being whether the fault is "capable". The Commission's determination respecting the capability of the fault at the North Anna site was the concept underlying most of the issues raised in this appeal.

"Capability" is a regulatory term of art created to avoid confusion with the term "active fault" as used in the scientific community. Inquiry into and a determination of capability, *vel non*, will become essential under the following circumstances: 1) establishing the Safe Shutdown Earthquake, Appendix A, §§ IV(a)(7), V(a)(1); investigating for surface faulting, Appendix A, §§ IV(b)(4) and (7); and determining the need to design the plant facilities for surface faulting. Appendix A, § V(b).

A "capable fault" is defined in Appendix A, § III(g) as follows:

"A 'capable fault' is a fault which has exhibited one or more of the following characteristics:

(1) Movement at or near the ground surface at least once within the past 35,-000 years or movement of a recurring nature within the past 500,000 years.

(2) Macro-seismicity instrumentally determined with records of sufficient preci-

sion to demonstrate a direct relationship with the fault.

(3) A structural relationship to a capable fault according to characteristics (1) or (2) of this paragraph such that movement on one could be reasonably expected to be accompanied by movement on the other.

In some cases, the geologic evidence of past activity at or near the ground surface along a particular fault may be obscured at a particular site. This might occur, for example, at a site having a deep overburden. For these cases, evidence may exist elsewhere along the fault from which an evaluation of its characteristics in the vicinity of the site can be reasonably based. Such evidence shall be used in determining whether the fault is a capable fault within this definition.

Notwithstanding the foregoing paragraph III(g)(1) (2) and (3), structural association of a fault with geologic structural features which are geologically old (at least pre-Quaternary) such as many of those found in the Eastern region of the United States shall, in the absence of conflicting evidence, demonstrate that the fault is not a capable fault within this definition."

It is readily apparent that the definition is composed of three distinct parts. The first paragraph defines a "capable" fault as one exhibiting one or more of three characteristics: relatively recent movement, macroseismicity,[7] structural relationship to a

---

earthquake which produces the maximum vibratory ground motion for which certain structures, systems, and components are designed to remain functional." Appendix A, § III(c).

**5.** Surface faulting is the "differential ground displacement at or near the surface caused directly by fault movement. . . ." Appendix A, § III(f).

**6.** A fault is: "a tectonic structure along which differential slippage of the adjacent earth materials has occurred parallel to the fracture plane." Appendix A, § III(e).

**7.** Macroseismicity is an event of Intensity III or more according to the Modified Mercalli scale, which is a system used to measure the "intensi-

ty" of earthquakes. *See, C. F. Richter, Elementary Seismology*, pp. 136–38 (1958).

"Intensity" of earthquakes is the "measure of its effects on man, on man-built structures, and on the earth's surface at a particular location." Appendix A, § III(b). The Modified Mercalli scale was originally developed in 1931 by H. O. Wood and Frank Neumann. *See Richter, supra.* Although derivations have been advanced by others, *see Richter, supra,* and *Leet and Judson, Physical Geology*, pp. 390–391 (4th ed. 1972), the scale is basically as follows:
"MODIFIED    MERCALLI    INTENSITY
SCALE OF 1931
(Abridged)
I. Not felt except by a very few under especially favorable circumstances. . . .

capable fault. The second paragraph allows for consideration of evidence existing at other places along the fault. The third paragraph permits consideration of geographically old structural features in determining whether the fault is or is not a capable fault as defined.

The administrative determinations challenged here were based alternatively on the requirements of the first and the third paragraphs. It was determined that the fault had not exhibited any of the characteristics of capability as specified in paragraph one and that the geologic features with which the fault zone was structurally associated were geologically old, and given the lack of conflicting evidence, this was sufficient to show lack of capability under paragraph three.

Focusing on the first paragraph, we are immediately faced with a question of construction. The Coalition contends the first paragraph must be construed so as to require that all three characteristics must be carefully disproven before a given fault can be classified as "incapable." It specifically argues that the second characteristic (macroseismicity) must be disproven through non-waivable instrumental analysis. The intervenor, VEPCO, views such a construction as creating an unnecessary "straight-jacket", and the Commission argues that the inherent flexibility of Part 100 makes such a construction inherently defective.

■ The Commission position is preferred. The application of Section III(g) in this case is an essentially contemporaneous construction by an agency possessing a uniquely broad grant of authority to promulgate appropriate regulations, and as such must be given great weight. *See, Power Reactor Dev. Co., supra.* In addition, the Licensing Board had the benefit of testimony of certain staff members who had been involved in the development of the regulations. Their testimony as to the meaning and interpretation to be given the

II. Felt only by a few persons at rest, especially on upper floors of buildings. Delicately suspended objects may swing. . . .
III. Felt quite noticeably indoors, especially on upper floors of buildings, but many people do not recognize it as an earthquake. Standing motorcars may rock slightly. Vibration like passing truck. Duration estimated. . . .
IV. During the day felt indoors by many, outdoors by few. At night some awakened. Dishes, windows, and doors disturbed; walls make creaking sound. Sensation like heavy truck striking building. Standing motorcars rocked noticeably. . . .
V. Felt by nearly everyone; many awakened. Some dishes, windows, etc., broken; a few instances of cracked plaster; unstable objects overturned. Disturbance of trees, poles, and other tall objects sometimes noticed. Pendulum clocks may stop. . . .
VI. Felt by all; many frightened and run outdoors. Some heavy furniture moved; a few instances of fallen plaster or damaged chimneys. Damage slight. . . .
VII. Everybody runs outdoors. Damage *negligible* in buildings of good design and construction; *slight to moderate* in well built ordinary structures; *considerable* in poorly built or badly designed structures. Some chimneys broken. Noticed by persons driving motorcars. . . .
VIII. Damage *slight* in specially designed structures; *considerable* in ordinary substantial buildings, with partial collapse; *great* in poorly built structures. Panel walls thrown out of frame structures. Fall of chimneys, factory stacks, columns, monuments, walls. Heavy furniture overturned. Sand and mud ejected in small amounts. Changes in well water. Persons driving motorcars disturbed.
IX. Damage *considerable* in specially designed structures; well-designed frame structures thrown out of plumb; *great* in substantial buildings, with partial collapse. Buildings shifted off foundations. Ground cracked conspicuously. Underground pipes broken.

X. Some well-built wooden structures destroyed; most masonry and frame structures destroyed with foundations; ground badly cracked. Rails bent. Landslides considerable from river banks and steep slopes. Shifted sand and mud. Water splashed (slopped) over banks. . . .
XI. Few, if any (masonry), structures remain standing. Bridges destroyed. Broad fissures in ground. Underground pipelines completely out of service. Earth slumps and land slips in soft ground. Rails bent greatly.
XII. Damage *total*. Waves seen on ground surfaces. Lines of sight and level distorted. Objects thrown upward into the air." *United States Department of Commerce, Earthquake History of the United States*, Publication 41-1, pp. 3–4 (1973).

regulations provides substantial support for the Commission's findings.

In reviewing the evidence taken before the Licensing Board, the Appeal Board found "the saprolite[8] study demonstrates beyond reasonable question that there has been no discernible movement of the fault in at least 500,000 years. Joint Appendix, p. 111. In addition, it noted that "the principal other evidence—involving the dating of the overlying soil and of joint sets[9] in the granitic gneiss[10]—would not be inconsistent with a finding that the last movement was nearly 200 million years ago." Joint Appendix, p. 111, n. 12. The Appeal Board also agreed with the Licensing Board that no macroseismicity associated with the North Anna faults had been recorded, and that the North Anna faults were not structurally related to a capable fault.

There is substantial evidence to support the Appeal Board's findings. There were at least three separate tests performed at the site confirming the date of the last movement: the saprolite study, the soil analysis, and the potassium-argon dating of the adularia[11] at the joint sets.

At the North Anna site, the saprolite, averaging 80 to 100 feet deep, overlies the bedrock and the fault which is in the bedrock extends up from the bedrock, through the saprolite, to the base of the overlying soil. If there had been movement on the fault after formation of the saprolite, the saprolite would reflect it. The saprolite was subjected to numerous investigations, including visual, measurements of the joint and fracture systems, and microscopial analysis. These studies convinced all the experts that the fault had not moved since the saprolite was formed. Various theories were advanced concerning the rate of growth of the saprolite. Applying the most conservative theory to the depths of saprolite found at the site, the geology experts were virtually unanimous[12] in their conclusion that the absence of movement in the saprolite demonstrated that the fault had not moved in over 500,000 years. In fact, the staff experts of the Commission were convinced that the fault had not moved for a minimum of one to two million years and felt reasonably assured that the fault had not moved in over 200 million years.

Soil analysis was also used to date the last movement of the fault. This analysis involved a literature search, a comparison of the soil characteristics with those described in the literature, mineralogical studies to determine whether the soil had formed on residual or transported material, and a soil particle size distribution analysis together with microscopic examination of these sections to determine whether there had been any disturbance of the minerals in the soil. The expert who conducted the soil study concluded the soil was at least one million years old and that the fault had not moved during that time. The expert for the United States Geological Survey agreed that there had been no movement of the fault since the soil was formed, however, he could not judge the length of time more definitely than one of "considerable antiquity." The Licensing Board felt the soil study was the least reliable of the three dating methods used, and weighted it accordingly.

The third study establishing that the fault was not capable was the dating of adularia taken from joint sets found within the granitic gneiss underneath the saprolite. The joints intersected and offset the fault

---

8. Saprolite is a soft, earthy, clay-rich, thoroughly decomposed rock formed in place by chemical weathering of igneous and metamorphic rock. *American Geological Institute Glossary of Geology*, (1972).

9. A joint is a surface of actual or potential fracture or parting in a rock without displacement. A joint set is a regional pattern of groups of parallel joints. *Id.*

10. Gneiss is a foliated rock. *Id.*

11. Adularia is a moderate-to-low temperature mineral of the alkali feldspar group. *Id.*

12. One geologist, testifying for the Coalition, was unconvinced by the saprolite studies. However, his conclusion was based on studies in Vermont where no saprolite exists. Joint Appendix, p. 694–699.

zones, indicating to the experts that the fault predates the joints. By the potassium-argon dating method, it was determined that the adularia contained in the joint sets was at least 250 million years old. The Licensing Board found it very unlikely that the fault zones had moved in the last 200–250 million years.

Both the Licensing Board and the Appeal Board placed the major emphasis on the saprolite study in reaching their decisions because of its greater reliability. Both concluded that the fault at the site had been inactive for at least 500,000 years and, in all likelihood, for as long as 200 million years.

The investigations also revealed no evidence of macroseismicity related to the fault. In fact, there has been only one historically recorded macroseismic event (observable by people) within ten miles of the site and only 1.2 events in central Virginia every two years over the past fifty years. There are no macroseismic events known to be related to any fault in the inner Piedmont, and witnesses testified that no macroseismicity associated with the fault in question had been recorded.

The third characteristic of Section III(g), paragraph one, is whether the fault being investigated bears a structural relationship with a capable fault. As in the two characteristics discussed above, substantial evidence was introduced to establish that the fault zone at the site has not exhibited such a structural relationship. The witnesses testified that not only was there no evidence of any relationship to a capable fault, there are no known, or even suspected, capable faults in the inner Piedmont with which the site fault could be associated.

To be judged as a capable fault, the fault at North Anna must exhibit one or more of the characteristics listed in Section III(g), paragraph one. There was substantial evidence presented to support the Commission's view that none of these characteristics were present.

The regulations provide an alternative test, which the Licensing Board and the Appeal Board also used as support for their findings. This test is contained in the last paragraph (3) of Section III(g), which provides that notwithstanding the three criteria discussed in paragraph 1, structural association of a fault with geological features which are geologically old (at least pre-Quaternary),[13] in the absence of conflicting evidence, shall demonstrate that the fault is not capable. Again, there was sufficient evidence presented to establish that all geologically structural features associated with the North Anna fault were well within the "geologically old" definition.

A finding of non-capability under the last paragraph of Section III(g) is supported by the evidence presented to the Licensing Board. The paragraph particularly mentions as an example, geologically old structural features "found in the Eastern Region of the United States." Staff members who assisted in the development of Section III(g), testified that the last paragraph was specifically designed to be applied to faults located in the Eastern United States, whereas the more stringent standards of the first paragraph were largely designed for use in the more seismically active West Coast region of the country.

The Coalition contends the creation and presence of Lake Anna creates an extra risk at the North Anna site. It is contended that it might induce reaction of the non-capable fault. The Licensing Board and the Appeal Board concluded there was reasonable assurance that the lake will not reactivate the fault. This finding is based on substantial evidence in the record.

Two lines of investigation were followed in evaluating the effect of Lake Anna. First, an empirical investigation was undertaken wherein the investigators studied every one of the twelve documented instances (worldwide) in which reservoirs induced earthquakes, and related those empirical findings to the conditions at North Anna.

---

**13.** Quaternary is a period designation generally thought to cover the last two or three million years. *Glossary of Geology, supra.*

Secondly, a more theoretical investigation was conducted which analyzed the conditions under which lake-induced seismic activity might be anticipated.

The empirical study established that thousands of reservoirs have been impounded without event, including 28,000 in the United States alone. When a reservoir has been found to trigger an earthquake, it has done so shortly after filling. In twelve such instances, mentioned earlier, seismic activity began within one year after filling the reservoir. At North Anna three years have already passed without incident.

The theoretical study produced the same result. According to the conditions at the site, the risk of Lake Anna reactivating the fault is "vanishingly small." However, even though the Commission agreed with the results of the investigations, VEPCO has been required to install a microseismic monitoring network which is expected to provide confirmatory evidence or alert VEPCO to any possible change of conditions.

All the evidence supports the findings of the administrative bodies.

The regulations call for a "reasonable investigation", Section IV(b)(4) n.7, and "reasonable assurance", Section IV. It seems apparent that the requirements of the regulations were more than met by the investigations conducted at the North Anna site. They were extremely detailed and professionally done. In addition, much of the investigation itself, including the evaluation of the data gathered, was performed by Commission staff members who assisted in the development of the regulations. Their testimony that the investigations provided more than reasonable assurance that the fault is incapable should carry great weight. Reasonable investigation has been made and the conclusions approved with reasonable assurance.

■ Neither the Atomic Energy Act nor the regulations require totally risk-free siting. The Act requires "adequate protection to the health and safety of the public." 42 U.S.C. § 2232(a), and the facility operation must not be "inimical" to the health and safety of the public. 42 U.S.C. § 2133(d). The regulations call for "reasonable assurance" and operation without "undue risk". 10 C.F.R. § 100.10(c)(1). The evidence in this case establishes that the fault is not "capable" and has not moved for at least 500,000 years. Although this is not an absolute guarantee, it surely establishes that the site is not "inimical" to the public health and safety. There is nothing in the Act or the regulations proscribing siting a nuclear reactor on a fault that has not moved in 500,000 to 200 million years. Absolute risk-free siting is similar to other absolute positions and arguments that have been rejected by the courts. *See, Power Reactor Development Co., supra*, 367 U.S. at 414, 81 S.Ct. at 1538, 6 L.Ed.2d at 935; *Nader v. Nuclear Regulatory Comm'n, supra* at 1050. *Cf. Citizens For Safe Power v. Nuclear Regulatory Comm'n*, 173 U.S.App. D.C. 317, 327, 524 F.2d 1291, 1301 and note 15 (1975).

■ Nuclear power plants must be designed so that important plant systems and components remain functional during and after an earthquake without undue risk to public health and safety. They must be designed to meet the requirements of a Safe Shutdown Earthquake [14] and an Operating Basis Earthquake.[15] The earthquake design assumptions at the North Anna site were determined at the original licensing hearings, therefore the only issue remaining at the show cause hearing was whether the discovery of the fault altered the situation. In the show cause proceedings, it was deter-

---

**14.** See note 4, *supra*.

**15.** The Operating Basis Earthquake is "that earthquake which, considering the regional and local geology and seismology and specific characteristics of local subsurface material, could reasonably be expected to affect the plant site during the operating life of the plant; it is that earthquake which produces the vibratory growth motion for which those features of the nuclear power plant necessary for continued operation without undue risk to the health and safety of the public are designed to remain functional." Appendix A, § III(d).

mined that the noncapability of the fault was dispositive of the issue, and the presence of the faults made no difference with respect to earthquake design assumptions.

Nevertheless, the Licensing Board did consider the adequacy of the earthquake design assumptions. We find there is substantial evidence to support its finding that the assumptions at North Anna were appropriate.

The regulations concerning the determination of the Safe Shutdown Earthquake and the Operation Basis Earthquake are contained in Appendix A, § V(a)(1)(i)–(iii) and (2).

In accordance with the procedures outlined in these regulations, VEPCO selected the largest earthquakes that had occurred in the region of the site and surrounding regions and correlated them to the site. The three earthquakes chosen were the Charleston, South Carolina quake in 1886, the Giles County quake in 1897, and the Wilmington, Delaware quake of 1871. The Charleston earthquake had an intensity of IX on the Modified Mercalli scale [16] and was connected with local geologic features. Recurrence of such a shock would produce an effect at the site of about Intensity V. The Giles County tremor had an Intensity VIII and was located about 170 miles southwest of the North Anna site. Making the assumptions required under Section V(a)(1)(iii), it was estimated that a similar shock would be barely perceptible at the site. The Wilmington earthquake had an Intensity VII and is located in the Piedmont province. Section V(a)(1)(ii) required this to be evaluated as if it had occurred at the site. The necessary vibratory ground motion accelerations were determined on this basis. All the experts testified that the design assumptions for the plant for an Intensity VII earthquake was a conservative estimate and that if the faults were not capable, the assumptions were still valid.

The Licensing Board also felt there was no need to make any further determination of need to design for surface faulting under Section V(2) because the faults at the site were not capable and the testimony established there were no known capable faults in the area of the site. Such a finding is well within the demands of the regulation and is supported by substantial evidence.

The Coalition's argument that other plants in other areas have a more stringent design base is irrelevant as to the determination involved at the North Anna site.

Based on the evidence in the record, the Licensing Board had sufficient grounds for its findings.

■ The Coalition contends that Section III(g)(2) requires that the absence of macroseismicity directly related to the fault must be proven by instrumental determination. This is an incorrect interpretation of the regulations.

The regulations under Appendix A speak of "reasonable investigation". It seems that to require VEPCO to install a monitoring system at a site as seismically quiet as North Anna would be patently unreasonable. It would require many years of recording to prove anything about the site.[17]

Section III(g)(2) does not place a mandatory requirement of monitoring on the applicant. The regulations were drafted with the stated purpose of being "flexible". Two of the Commission's witnesses were men involved with developing the regulations and they both testified that all requirements had been met, including Section III(g)(2).

Section IV also supports the Commission's position that mandatory monitoring is not required. This section is entitled "Required Investigations". It is relevant that the section does not include mandatory macroseismic monitoring.

The final support for the Commission's position is the fact that such monitoring

16. See note 7, *supra*.

17. At the time of hearing VEPCO had a monitoring network installed at the site for another

purpose. However, it had the capability of detecting macroseismicity. It had recorded none in its first few weeks of operation. VEPCO Brief, p. 50.

would be irrelevant in light of the other evidence introduced. As the Appeal Board stated ". . . the presence of the undisturbed saprolite establishes that any macroseismicity that may have been felt at the site could not have been as a result of movement across the fault. Thus, in the words of the regulation, it could not have had a 'direct relationship with the fault'." Joint Appendix, page 113.

The Commission's interpretation of its own regulation is entitled to great deference. *Nader v. Nuclear Regulatory Commission, supra.* There is sufficient reason to support its interpretation of Section III(g)(2) as being proper.

The Coalition also contends that the investigation was incomplete as to Section III(g)(3) in that the faults at North Anna were not "traced" sufficiently to determine how far they extend. Therefore, the Coalition contends it is impossible to state that the North Anna faults are not structurally related to a capable fault.

Again, it seems the Coalition is imposing inflexible standards on a flexible regulation. The necessity of flexibility in the regulations has been observed numerous times in this case, and we are now examining one more example. The expert testimony was that the faults in the North Anna region are old and inactive, are covered with considerable saprolite, and have no topographic expression. Under these conditions, tracing of the faults is almost impossible.

Appendix A requires a "reasonable investigation". Such was performed in this case. The area surrounding North Anna was examined in detail using mapping techniques, as well as checking out all prominent lineaments.[18] There was no evidence of faulting or displacement. Additionally, there was substantial evidence presented that the faults at the site are of limited extent, and appear to be minor features. To the northeast they appear to die out by splaying[19]

and no traces appear on the far side of Lake Anna. VEPCO checked all new construction cuts, road cuts, railroad cuts, and all new exposures west and southwest of the site and found no displacement.

The results of the saprolite study also defeat the Coalition's contentions. The presence of geologically old and undisturbed saprolite reasonably rules out any possible structural relationship between the North Anna fault and a capable fault.

The Coalition urges this court to interpret the "reasonable assurance" standard adopted by the Commission and approved by the United States Supreme Court in *Power Reactor Development Co., supra,* as imposing on an applicant the burden of proving its position "beyond a reasonable doubt." A similar argument concerning a "compelling reasons" standard was rejected in *Power Reactor Development Co., supra.*

The regulations describe the nature of the investigations required to determine not only site suitability but also to determine reasonable assurance that a nuclear plant can be constructed and operated at a proposed site without undue risk to the health and safety of the public. Had the regulations been intended to require proof beyond a reasonable doubt we believe it would have been clearly so stated. The language "without undue risk" does not preclude some risk. We cannot conclude from the language used in the regulations that it was intended the beyond a reasonable doubt standard was to be followed.

The Licensing Board equated "reasonable assurance" with "a clear preponderance of the evidence" standard. The Appeal Board found it did not need to reach the question of what standard applies because "no matter how the standard is articulated, it plainly has been satisfied in this instance by the results of the saprolite study." Joint Appendix, page 114. We agree.

---

18. Lineament is a term widely applied to lines appearing in aerial photographs which represent beds, veins, faults, joints, etc. *Glossary of Geology, supra.*

19. Splaying out of a fault is its dying out by dispersing into a number of minor faults. *Id.*

The standard suggested by the Coalition places too great a burden on the applicant especially in light of the scientific precision in seismic studies. However, in this case VEPCO met even the Coalition's standard with the introduction of the saprolite studies, which established beyond a reasonable doubt that the North Anna fault was not capable.

This court affirms the Atomic Energy Appeal Board on all issues raised in this appeal.