AMERICAN TRADING TRANSPORTA-
TION COMPANY, INC., et
al., Appellants,

v.

UNITED STATES of America, et al.

No. 85–5697.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 7, 1986.
Decided May 23, 1986.

Jeffrey R. Masi, with whom Anne E. Mickey and Linda L. Martin, Washington, D.C., were on brief, for appellants.

Michael J. Ryan, Asst. U.S. Atty., for appellee, United States of America, with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth, R. Craig Lawrence and John H.E. Bayly, Jr., Asst. U.S. Attys., Washington, D.C., were on brief, for appellee, United States of America.

William E. McDaniels, with whom Kevin T. Baine, Jonathan Blank and John W. Angus, III, Washington, D.C., were on brief, for appellees, Seatrain Lines, Inc., et al.

Richard H. Saltsman, Washington, D.C., was on brief, for appellees, Archon Shipping, Inc., et al.

Before ROBINSON, Chief Judge, and GINSBURG and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

Dissenting opinion filed by Circuit Judge SILBERMAN.

GINSBURG, Circuit Judge:

Appellants are owners and operators of small, unsubsidized vessels engaged in the Alaskan oil trade. They challenge a Maritime Administration (Marad) waiver decision which temporarily allowed two subsidized, very large crude carriers (VLCCs) to operate in this domestic Alaskan trade. The district court denied appellants' request for a preliminary injunction and simultaneously granted Marad's motion for summary judgment. *See American Trading Transportation Co. v. United States,* 610 F.Supp. 457 (D.D.C.1985). We conclude that, in granting the permission appellants challenge, Marad interpreted its waiver regulation in a manner inconsonant with the governing statute. We therefore vacate the judgment summarily entered against appellants and instruct the district court to return the case to Marad for further consideration consistent with this opinion.

I.

The Merchant Marine Act of 1936, 46 U.S.C. § 1101 *et seq.* (1982) (the Act), was enacted to promote a well-equipped and efficient merchant fleet owned and operated by United States citizens and supported by domestic shipbuilding and repair facilities. *See id.* at § 1101. To advance these purposes, the Act requires every vessel sailing under this nation's flag to be owned by United States citizens, and staffed by a domestic crew. *See id.* at §§ 65b, 1132(a). The construction and operation costs of United States ships, however, are substantially higher than those of their foreign counterparts; for this reason, U.S.-flag vessels would not be positioned to contend with foreign-flag vessels in offering shipping services, absent government intervention or protection. Congress therefore created two separate programs to shelter U.S.-flag ships.

First, the "Jones Act," as it is popularly known, restricts the domestic trade—the carriage of goods between ports in the United States—to U.S.-flag vessels built in the United States. *See* 46 U.S.C. § 883.[1]

---

1. The Act includes as part of the United States the "areas and installations in the Republic of Panama made available to the United States pursuant to the Panama Canal Treaty of 1977 [and] the agreements relating to and implementing that Treaty...." 46 U.S.C. § 1244(g). Trade between Alaska and the Panama Canal

Thus protected from low-cost foreign competition, these ships are otherwise unsubsidized. Second, the Merchant Marine Act provides for subsidies to offset the higher costs of building (construction-differential program) and operating (operating-differential program) in the United States. *See id.* at §§ 1151 *et seq.*, 1171 *et seq.* Ships constructed and operated with the aid of these subsidies are positioned to compete with foreign-flag ships and therefore ply the foreign trade.

The subsidized ships, because of their cost-structure advantage over unsubsidized U.S.-flag vessels, are prohibited from engaging in the domestic trade except under narrow, specified circumstances. *See* 46 U.S.C. § 1156. This case involves an excepted circumstance. The statutory exception at issue allows the Secretary of Transportation to approve a temporary waiver of the domestic trade ban for a particular subsidized vessel, for a period not to exceed six months in each year, if consent to the temporary transfer is "necessary or appropriate to carry out the purposes of this [Act]." *Id.* The consent to transfer is conditioned upon the repayment of a proportionate share of the construction-differential subsidy and the forfeiture of any operating subsidy during the period of domestic employment. *See id.; see also id.* at § 1175(a).[2] The Secretary delegated this waiver power to Marad.

In 1977, Marad issued a regulation to guide certain exercises of its waiver power. *See* 42 Fed.Reg. 33035 (1977) (codified at 46 C.F.R. Part 250). The regulation applies only to waivers for subsidized ships over 100,000 deadweight tons (dwt) to partic-

ipate in the longest leg of the Alaskan oil trade: from Valdez, Alaska to the Panama Canal. *See* 46 C.F.R. Part 250 (1985). The regulation is primarily procedural: it details the information a waiver application must include; and it contains a timetable for comments by interested persons, replies by the applicant, and a decision by Marad. *See id.* at §§ 250.3, 250.4. Any "competitor" may file a formal protest, and Marad is obliged to consider objections so presented. *See id.* at § 250.4. A "competitor" is defined by the regulation as the owner or operator of an unsubsidized U.S.-flag vessel eligible for operation in the domestic trade. *See id.* at § 250.2(c).

The regulation sets forth no substantive criteria controlling Marad's appraisal of a waiver application. Marad has stated, however, that it follows the standard contained in § 506 of the Act; that provision instructs the administrator to determine whether the consent to transfer is "necessary or appropriate to carry out the purposes of this Act." *See Opinion of the Maritime Administration on Approving Two Applications and Denying One Application* at 43, *reprinted in* Joint Appendix (J.A.) at 64 [hereinafter cited as *Marad Opinion*].

An additional, more precise criterion may be derived from the regulation's instruction that, to qualify for a waiver, an applicant must aver that "suitable vessels of a competitor would not be available." *See* 46 C.F.R. § 250.3(d). Marad has apparently interpreted this provision as according to "suitable" unsubsidized vessels an absolute veto over any waiver for a time period

---

therefore ranks as domestic rather than foreign trade.

**2.** As appellants point out, repayment of the construction subsidy decreases but does not eliminate the subsidized ships' competitive advantage. Subsidized ships working in the domestic trade must repay principal, but they bear no attendant carrying charge; they can therefore work at lower rates than the unsubsidized ships, which must pay interest on their borrowings for construction. The Supreme Court has recognized this continuing (time-value) advantage as a "considerable reason to restrict the extent to

which subsidized vessels" are granted temporary waivers allowing them to "enter and exit the domestic market." *Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. 572, 588 n. 30, 100 S.Ct. 800, 810 n. 30, 63 L.Ed.2d 36 (1980). Permanent waivers, which effectively transform a subsidized ship into an unsubsidized one, do not raise the same concerns; vessels granted permanent waivers must pay interest charges on their subsidies and are no longer able to alternate between the foreign fleet and the domestic fleet at will. *See id.* at 588–89 & n. 31, 100 S.Ct. at 810 & n. 31. *But see* diss. at 956 n. 13.

during which such vessels are or will be unemployed. *See* Brief for Seatrain *et al.* at 26–27; *cf. Atlantic Richfield Co. v. United States,* 774 F.2d 1193, 1204 (D.C. Cir.1985) (holding that it was "appropriate" for Marad to condition a waiver on the continued unavailability of suitable unsubsidized vessels). The regulation defines a "suitable" vessel as one 100,000 dwt or larger and qualified to participate in the domestic trade. *See* 46 C.F.R. § 250.2(h).

In the waiver proceeding at issue, Marad accepted applications from three subsidized VLCCs.[3] Upon issuing a public notice, Marad promptly received comments and protests from the owners of many unsubsidized vessels, some larger than 100,000 dwt and some smaller. After a round of responses, counter-responses, and rebuttals, Marad granted waivers to two of the applicants. *See Marad Opinion* at 59–61, *reprinted in* J.A. at 80–82.

The small, unsubsidized tankers—the appellants in this case—argued to Marad that its regulation was substantively and procedurally invalid. They contended that their competitive interests should be considered and that those interests warranted denial of the waiver applications. *See Marad Opinion* at 12–13, *reprinted in* J.A. at 33–34. In response, Marad stated that its regulation had been promulgated pursuant to correct procedures and that substantive guidelines were not needed in the regulation because they were supplied by the Act itself. *See id.* at 43, *reprinted in* J.A. at 64. The agency then swiftly rejected the protests of vessels under 100,000 dwt;

such vessels, Marad declared, lacked "standing" to protest. *See id.* at 51–56, *reprinted in* J.A. at 72–77.

For the ruling that the small vessels had no standing to complain, Marad relied upon a line of its own decisions dismissing protests of vessels under 100,000 dwt because they failed to qualify as "suitable" vessels for the Alaska-Panama trade and, therefore, were not within the category of "competitors" authorized to protest under the regulation. *See id.* The agency then recited evidence indicating that vessels under 100,000 dwt are less suitable for this particular long voyage and that such vessels, in fact, account for only a small part of that trade even when no subsidized ships participate. *See id.* Next, without discussing the substance of the small vessels' protest, Marad concluded that waivers for two subsidized VLCC's were necessary and appropriate to serve the purposes of the Act. *See id.* at 58–61, *reprinted in* J.A. at 79–82.[4]

■ The owners of the small, unsubsidized tankers sought review in the district court. That court granted summary judgment for Marad. It held that appellants could not challenge the procedural regularity of the rule's promulgation seven years after the fact, *see American Trading,* 610 F.Supp. at 461–62, *reprinted in* J.A. at 90–91, and that the tonnage limitation (100,000 dwt) had not been shown to be arbitrary, capricious, or inconsistent with the statute, *see id.* at 462–63, *reprinted in* J.A. at 92–93.[5]

---

3. The three ships were owned and operated by the following companies: the MARYLAND was owned by Boston VLCC Tankers, Inc. VI and chartered by Seatrain Lines, Inc.; the BROOKLYN was chartered by Archon Shipping, Inc. and American Petrofina, Inc.; the ARCO SPIRIT was owned by Arco Transportation Co. Marad granted the applications of the MARYLAND and the BROOKLYN and denied the application of the ARCO SPIRIT. The owners/operators of the successful vessels intervened as defendants in the district court and on appeal. *See American Trading Transportation Co. v. United States,* 610 F.Supp. 457, 459 (D.D.C.1985), *reprinted in* J.A. at 84.

4. Marad dismissed the protests of the unsubsidized vessels over 100,000 dwt on the ground that they had failed to show that any of them would actually be available for work at the times for which the waivers were requested. *See Marad Opinion* at 48–50, *reprinted in* J.A. at 69–71.

5. Appellants also raised claims concerning limitations on their opportunity to respond to comments by the applicants and surreptitious consideration by Marad of the agency's financial stake in the vitality of one of the VLCC owners/operators. *See American Trading,* 610 F.Supp. at 463–64, *reprinted in* J.A. at 93–95;

## II.

We turn first to the question whether the owners of small, unsubsidized tankers have "standing" under Marad's regulation to protest a waiver application. Marad's position on this issue is an enigma. The agency's opinion in this case includes a statement that owners of tankers under 100,000 dwt do *not* have standing to protest. *See Marad Opinion* at 51–52, *reprinted in* J.A. at 72–73. Presumably for this reason, Marad refused to confront and rule on the substance of appellants' protests. In a cryptic footnote to its opinion, however, Marad offered this second thought: "[T]hese protestors can and obviously do participate to some extent in the agency action but under the rule they cannot block approval of the applications." *Id.* at 52 n. 8, *reprinted in* J.A. at 73. And at oral argument, counsel for the agency backtracked further. Counsel suggested that we view the reference to "standing" in Marad's opinion as simply an unfortunate word choice. He represented this to be Marad's position: appellants *did* have standing to protest but, unlike the owners of unsubsidized tankers over 100,000 dwt, they lacked power to block or veto a waiver.

We find it difficult to reconcile Marad's footnote and its counsel's position at oral argument with the body of Marad's opinion. If the appellants had standing to "participate to some extent," why was the substance of their protests ignored in the agency's decision?

The section of Marad's opinion concerning the protests of small, unsubsidized tankers is devoted entirely to a discussion of why they lacked standing. Citing past agency holdings as precedent, Marad first stated that its interpretation of the rule precludes standing for vessels under 100,-000 dwt. As justification for this interpre-

tation, Marad referred to the relatively small part these tankers play in the Alaska-Panama trade. *See Marad Opinion* at 51–56, *reprinted in* J.A. at 72–77. The various comments and considerations raised by the owners of small, unsubsidized tankers do not appear anyplace in Marad's evaluation of the waiver applications. Compare *id.* at 12–19, *reprinted in* J.A. at 33–40 (protests of Victory, Cove, and Sun) *with id.* at 51–56, *reprinted in* J.A. at 72–77 (Marad discussion of small vessels' protests). The "standing" or right to "participate to some extent" of these small vessels, it thus appears, did not even figure as a "sometimes thing" in Marad's ruling on the merits.

■ We need not tarry over the agency's conflicting signals, however, because the regulation at issue, on straight, sensible reading, does accord standing to the small tankers as "competitors." The regulation applies the 100,000 dwt limit to two categories of ships: first, to subsidized tankers eligible to apply for a waiver under the rule; and second, to unsubsidized tankers that qualify as "suitable" vessels for the trade. *See* 46 C.F.R. §§ 250.1, 250.2(h). "Suitable" vessels figure at two points in the regulation. The waiver applicant must aver that no "suitable" vessel is available to do the work for which the subsidized ship seeks a waiver. *See id.* at § 250.3(d). In addition, a suitable vessel that *is* available for such work and protests the waiver may automatically block the entry of a subsidized ship into the trade. *See* Brief for Seatrain *et al.* at 26–27.

· Nothing in the regulation, however, limits protestors to "suitable" vessels. On the contrary, the regulation allows protests by any "competitor" and defines "competitor" to encompass unsubsidized vessels without reference to any size restriction. *See* 46 C.F.R. § 250.2(c). Thus, the appellants

Brief for Appellants at 48–57. The district court rejected both claims. *See American Trading,* 610 F.Supp. at 463–64, *reprinted in* J.A. at 93–95. Our disposition does not require us to reach these claims; nonetheless, in light of the curious circumstances surrounding the waivers at issue, *see* Brief for Appellants at 51–55, it is within our

province to remind Marad that it may consider its financial interest in an applicant's continuing vitality only if 1) it does so openly and honestly, and 2) it allows other parties an opportunity to comment on that consideration. *See Independent United States Tanker Owners Committee v. Lewis,* 690 F.2d 908, 930–31 (D.C.Cir.1982).

may protest because they fit within the regulation's definition of a "competitor," but they may not automatically block a waiver because they do not qualify as "suitable" vessels.

### III.

■ As protestors with standing, appellants have a right to have their comments heard and considered by the agency. Appellants' comments covered a wide range. The most important objection appellants tendered, however, concerns an alleged indirect effect of the waivers on the segments of the Alaskan oil trade in which small unsubsidized tankers are primarily employed. Appellants complain of a "bumping" effect. They contend that when subsidized VLCCs are waived into the Alaska-Panama Canal segment of the trade, slightly smaller unsubsidized ships are "bumped" from that segment into the shorter segment of trade from Alaska to the West Coast. In turn, appellants say, vessels engaged in the Alaska-West Coast trade are bumped down into the Panama Canal-Gulf Coast and Panama Canal-East Coast segments of the trade, segments initially served by even smaller unsubsidized ships. Appellants claim that, as a result of this "bumping" process, the weight of the waivers is in fact felt, not by the large "suitable" vessels which can find work in another segment of the trade, but by the very small unsubsidized ships at the end of the line, ships that are ultimately "bumped" out of the market altogether. *See* Brief for Appellants at 33–34; Reply Brief at 4–12.

■ Appellants' "bumping" argument raises a concern that Marad is statutorily required to consider. The Act is intended to protect the entire merchant marine, subsidized and unsubsidized, large and small. *See Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 574, 100 S.Ct. 800, 802, 63 L.Ed.2d 36 (1980) (describing objective of statutory scheme "to protect and support the United States' shipping and shipbuilding industries"). The legislation indicates no solicitude for the interests of large, subsidized vessels that overrides consideration of the interests of small, unsubsidized ships. Indeed, to the extent that the Act expresses special concern for any vessels in the domestic trade, those vessels are the ones composing the unsubsidized fleet. *See Atlantic Richfield Co. v. United States*, 774 F.2d 1193, 1203 (D.C.Cir. 1985) ("dual purposes of the Act" are "to protect the unsubsidized domestic fleet from displacement by the subsidized fleet, while still ensuring adequate domestic shipping capacity").

■ Appellants, it bears emphasis, seek no trump card or veto power; they ask merely for consideration of their interests. *See* Reply Brief at 13 (appellants request "[a]n opinion compelling MarAd to consider the effect of temporary waivers on [their] segment of the [unsubsidized] fleet"). When Marad ignores their pleas, the agency shuts from its view a principal goal of the legislation: protection of the unsubsidized fleet.[6] To the extent that Marad's regulation, as interpreted by the agency, permits Marad to disregard appellants' statutory interests, the regulation is substantively inconsistent with the Act.

■ Marad has thus far entirely avoided appellants' "bumping" argument. The agency's discussion of the unsuitability of these smaller vessels for the Alaska-Pan-

---

6. Although the legislation is also intended to protect the subsidized fleet, Marad need not consider the impact of a denial of a waiver request on the subsidized ships that compete with the applicant. *But see* diss. at 956, n. 14. The Merchant Marine Act protects the subsidized fleet by providing it with subsidies; the Act protects the unsubsidized fleet by reserving for it the domestic trade. *See* diss. at 951 n. 1. The Act does not protect either fleet, however, from competition within its own ranks. Marad must consider the impact of waivers on the unsubsidized fleet—when properly raised—because waivers threaten the precise mechanism that Congress chose to use to protect that fleet: the restriction of domestic trade to unsubsidized U.S.-flag vessels. Marad need not consider the impact of a waiver denial on the competitors of the subsidized applicant because Congress had no intention of protecting subsidized ships from competition with each other.

ama Canal trade, *see Marad Opinion* at 52–53, *reprinted in* J.A. at 73–76, leaves the "bumping" argument untouched.[7] Appellants could admit that they play only a small role in that longest segment of the trade and still insist that waivers for the Alaska-Panama segment eventually impact on small carriers in other segments of the Alaskan trade. The very economic incentive to use larger ships, which Marad relies upon in its discussion of suitability, *see id.* at 52, *reprinted in* J.A. at 73, has been cited by appellants in support of their "bumping" argument. If trade participants operating mixed fleets know they can get waivers for subsidized VLCC's, appellants maintain, such participants will shift their larger unsubsidized vessels to the other segments of the trade to make space for the VLCCs, for the larger the vessel they can use in each segment, the lower the cost will be. *See* Reply Brief for Appellants American Trading Transportation Co., Inc. *et al.* at 8–9 & n. 13.[8]

Marad's regulation, we add, does not itself reflect any prior, general evaluation of the "bumping" effect that would obviate a need for further consideration in individual cases. Nothing in the language of the rule suggests that Marad has considered the matter and concluded that the entry of subsidized VLCCs into the Alaska-Panama trade has no impact on small, unsubsidized vessels in other segments of the Alaskan oil trade.[9] The rule's supplementary information and statement of purpose are similarly silent on this issue. *See* 42 Fed.Reg. 33035 (1977) (codified at 46 C.F.R. Part 250).

Nor does the regulation's operation suggest that Marad has implicitly resolved this issue.[10] If the regulation were in fact based on an unannounced determination that waivers had no impact on members of the unsubsidized fleet who were not engaged in the Alaska to Panama trade, then the veto power given to "suitable"

---

7. The dissent's extended discussion of Marad's reasoning, and its own revision thereof, *see* diss. at 953–55, effectively confirms that the agency nowhere considered the appellants' primary contention: that they are suffering an indirect effect in the other segments of the Alaska trade as a result of the temporary waivers.

   The dissent, we note, relies most heavily, not on the agency's actual reasoning, but dominantly on the dissent's own assertion that "[i]t follows ... as the night the day," that the unsubsidized shippers will, in fact, suffer an indirect harm from the waivers. *See* diss. at 955. This admission—which Marad itself has never made—adds weight to our position. If it is inevitable that the unsubsidized shippers will be hurt, then it is incumbent upon Marad explicitly to acknowledge and address that point. Marad must consider the extent to which unsubsidized vessels will be disadvantaged and determine whether the benefit to be gained from the waivers justifies the injury to such vessels. We think such forthright consideration unavoidable if the agency is to carry out with fidelity its statutory charge to grant waivers only when necessary or appropriate to fulfill the purposes of the Act. We, of course, essay no instruction to Marad on the result it should reach after engaging in the requisite inquiry; we simply recall for the agency its duty not to ignore one of the primary concerns of the statutory scheme.

8. Appellants' arguments, as one of the intervenors has demonstrated, are subject to serious factual challenges, *see* Brief for Archon *et al.* at

23–24. Marad may well conclude after full consideration that the facts do not support the appellants' contention of severe, albeit indirect, impact. But the agency may not rely upon the arguments of an intervenor to support its position in court when it has not itself considered and addressed the issue. Marad must reach and explain its own conclusions before a court can uphold the agency's action. *See Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983).

9. The only provision in the regulation that could conceivably form the basis for Marad's assertion that the regulation itself addresses appellants' claims is the suitability provision. But, as already discussed, the fact that the small tankers are classified by the regulation as unsuitable for the Alaska-Panama trade does not bear on the question whether they may suffer an *indirect* impact from the waivers. *See supra* at 948–49.

10. Even if it existed, such an "implicit" agency holding on the question of indirect impact would be invalid. Marad may not simply assume—without notice, comment, or explanation—that appellants' statutory interests are not implicated when appellants claim that they are. Such an assumption based on no evidence would rank as arbitrary and capricious under the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(A) (1982).

vessels—which under this supposition are the only unsubsidized ships affected by waivers—would indeed be a sufficient safeguard of the unsubsidized fleet. In that case, the "dual purpose" of § 506—to protect the unsubsidized fleet and to assure adequate tonnage, *see supra* at 948— would both be fulfilled whenever the regulation's requirements were met. In short, had Marad implicitly determined that consents to temporary transfers have no impact on ships like appellants', the regulation should have authorized Marad to grant waivers automatically so long as the applicant has arranged work for which no suitable vessel is available.

▄▄▄▄▄▄ The regulation, however, does not operate in this self-executing manner. Marad has held that the regulation's requirements set only a procedural minimum, *see Marad Opinion* at 43, *reprinted in* J.A. at 64; even after an applicant has demonstrated that the required conditions exist—that there is work to be done and no suitable vessel available to do it—Marad may deny the waiver if the agency finds that the requested entry permission is not necessary or appropriate to fulfill the purposes of the Act. In other words, the regulation, as interpreted by Marad, implic-

itly acknowledges that there may be statutory concerns informing Marad's waiver decision that go beyond the availability of work and the unavailability of "suitable" vessels. The impact of the requested waiver on the remainder of the unsubsidized fleet is such a statutory concern. *See supra* at 948. Nothing in the structure or operation of the regulation, in sum, excuses Marad from considering this issue.[11]

## CONCLUSION

▄▄▄▄▄▄ Marad's failure to address appellants' "bumping" argument brings the agency into conflict with its statutory mandate. To the extent that Marad's interpretation of its regulation authorizes this disregard of appellants' alleged interests, the regulation is inconsistent with the Act. Marad may, of course, address this issue either through rulemaking or adjudication and, once it has done so, the agency need not reassess its position in every subsequent proceeding in which the issue arises.[12] Marad must, however, reach a decision—a decision based on a reasoned consideration of relevant evidence—before it can peremptorily dismiss the statutory interest appellants assert.[13] We therefore

11. We need not reach the issue of the regulations' procedural validity because we find that Marad's application of its rule in this case—an application which blocked consideration of the alleged infringement of appellants' statutory interests—was substantively inconsistent with the Act. We note in passing, however, that we do not comprehend the basis for the district court's lack of timeliness dismissal of the procedural claims. *See American Trading,* 610 F.Supp. at 461–62, *reprinted in* J.A. at 90–91. As we have noted, the language of the regulation gave appellants no notice that Marad would interpret it to block full consideration of their interests. *See supra* at 947. Had they challenged the rule at the time of promulgation, before the agency developed this interpretation, we would no doubt have found the challenge unripe for review because the harm appellants now claim they have in fact suffered, at that time, have been only speculative. No time limit bars appellants from challenging a regulation that, they allege, is currently being used in a particular proceeding to harm them in a way they could not have anticipated at the time the rule was adopted.

12. Contrary to the dissent's suggestion, *see* diss. at 956, Marad need not make this assessment anew in every individual case. The appellants in this case present a general argument that waivers have an indirect impact on small unsubsidized vessels in the other segments of the Alaska trade. Marad may, when it examines this claim, find that the mechanics of the industry either preclude such an impact or limit it to an insignificant size. In subsequent proceedings, the agency would be free to reject any renewal of evidence on the generalized occurrence of such indirect injury. Protestants in later proceedings would, of course, retain the right to argue that their case involves special circumstances that make the application of the general rule inappropriate, but all rules are subject to that type of challenge.

13. We do not ask the agency to institute any new procedures. *But see* diss. at 955–56. We merely insist that Marad consider protestants' claims when those claims are properly raised through procedures adopted by the agency itself. Nor does our holding increase the cost to Marad of approving a waiver application. *But*

vacate the district court's judgment and remand the case to that court with instructions to return the matter to the agency for consideration of appellants' indirect impact ("bumping") arguments.

*It is so ordered.*

SILBERMAN, Circuit Judge, dissenting:

The court holds that MarAd erred in permitting the temporary transfer into one segment of the Alaskan oil trade of two large oil tankers (Very Large Crude Carriers, or VLCCs) whose construction was subsidized by the Federal Government pursuant to Title V of the Merchant Marine Act of 1936, *codified as amended at* 46 U.S.C. § 1151 *et seq.* (1982). The majority determines that the Secretary's seemingly sweeping discretion to consent to such transfers "when necessary or appropriate to advance the purposes of [the Merchant Marine] Act" is circumscribed by a "special concern" that unsubsidized vessels enjoy vis-a-vis "large, subsidized vessels," Maj. Op. at 948. Accordingly, the majority concludes that MarAd did not adequately consider an argument in opposition to these temporary transfers advanced by certain domestic carriers whose construction was not directly subsidized.[1] Because I find nothing in the Act, its legislative history, or applicable precedent supporting the majority's limitations on the Secretary's discretion, and, in any event, ample indication of MarAd's consideration of the unsubsidized carriers' arguments and interests, I am obliged to dissent.

The Merchant Marine Act of 1936, 46 U.S.C. § 1101 *et seq.* (1982), declared it necessary for national defense and the development of commerce that the United States possess a merchant marine that would at all times suffice to carry both our domestic maritime trade and a substantial portion of our foreign maritime trade. The U.S. merchant marine was to be capable of serving as a naval and military auxiliary in time of war or national emergency, and it was to be composed of "the most *suitable* types of vessels ... manned with ... citizen personnel," insofar as practicable owned by American citizens and operated under the flag of the United States. *Id.* § 1101 (emphasis added). The Secretary of Commerce[2] was given broad discretion in administering the battery of grants and loans authorized by the statute to effectuate these goals, including operating subsidies, loan guarantees, a vessel-acquisition program, and the construction subsidies here at issue. *Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. 572, 585–86, 100 S.Ct. 800, 808, 63 L.Ed.2d 36 (1980).

To be sure, the 1936 Act was passed and amended against the backdrop of the Jones Act, 46 U.S.C. § 883 (1982). That earlier statute, passed in 1920, sought to protect American shipping and shipbuilding industries from foreign competition by reserving our domestic maritime trade for American-built and American-owned vessels. *See supra* note 1. The 1936 Congress recognized "from the outset that substantial limits would have to be placed upon the entry of

---

see diss. at 955–956. The costs of approval and disapproval are identical and are set by the statute: the cost is always attentive agency consideration of all comments relevant to the purposes of the Act.

1. The Jones Act, 46 U.S.C. § 883 (1982), sought to protect our shipping and shipbuilding industries by requiring that this country's domestic shipping trade be carried exclusively in vessels built in the United States and owned by United States citizens. *See Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. 572, 574–75 & n. 1, 100 S.Ct. 800, 802 & n. 1, 63 L.Ed.2d 36 (1980). That requirement creates a higher-than-market demand for American shipping, whose construction and operating costs exceed those of foreign

competitors, *see id.* at 574, 100 S.Ct. at 802, and this demand ensures that credit for American ship construction and operation is available at lower interest rates than would be the case in the absence of the Jones Act exclusion. Our domestic-trade shipping therefore enjoys an indirect construction and operating subsidy conferred by the Jones Act, as opposed to the direct construction-differential subsidy (CDS) and operating-differential subsidy (ODS) granted to our foreign-trade shipping by the 1936 Act.

2. This authority has been transferred to the Secretary of Transportation, and to her delegate, presently the Maritime Administration (MarAd). I will refer to the statutory administrator as "the Secretary" for convenience.

subsidized vessels into the domestic trade." *Seatrain*, 444 U.S. at 586, 100 S.Ct. at 808. As a result, both the 1936 Act and the 1938 amendments incorporate mechanisms to reduce the competitive impact of temporary transfers upon the unsubsidized fleet.

Section 506 of the Act originally authorized the Secretary, *inter alia*, to permit temporary transfers of subsidized vessels to the domestic trade for periods of three months, and only in cases of "emergency." 49 Stat. 1999–2000 (1936). In 1938, with war clouds gathering, Congress extensively amended the Act and, directly pertinent to the case at bar, modified Section 506 to permit the Federal Maritime Commission, at that time the designated statutory administrator, to "consent in writing to the temporary transfer of [subsidized vessels into the domestic trade] for periods not exceeding *six* months in any year, whenever the Commission may determine that such transfer is *necessary or appropriate to carry out the purposes of this Act.*" 52 Stat. 958–59 (1938) (emphasis added). If the emergency language had remained unamended, the majority's holding that the Secretary's discretion to consent to temporary transfers is severely circumscribed would have support.[3] But that is not the case. Accordingly, the Supreme Court has described the power to consent to such temporary transfers under the Act as amended as a "highly discretionary administrative decision." *Seatrain*, 444 U.S. at 589, 100 S.Ct. at 810.

The extension of the transfer period and the substitution of a statutory standard vesting much broader discretion in the Secretary were balanced, however, by further amendments affording new protections to the unsubsidized fleet. The Secretary's consent was conditioned upon cessation of the transferred vessel's operating-differential subsidies (ODS) during the period of operation in the domestic trade, and upon repayment by the transferred carrier of a percentage of the vessel's construction-differential subsidy (CDS) directly proportional to the time spent in the domestic trade relative to its economic life.[4]

Although the 1936 and 1938 enactments balanced the interests of subsidized vessels temporarily transferred into the domestic trade against the interests of unsubsidized vessels, Congress did not expressly refer to the Jones Act in Section 506, much less require, as does the majority, that the Secretary explicitly consider the impact of temporary transfers on affected portions of the domestic fleet.[5] To the extent that the conflicting interests and policies at stake were not completely resolved by the 1936–1938 enactments, Congress confided the

---

**3.** The appellants argued before MarAd, and reiterate before us, that the emergency requirement was somehow retained under the 1938 amendment despite its adoption of far more sweeping terms. *See* Brief for Appellants at 7–9; Opinion of the Maritime Administrator, Dockets S–761, S–762 and S–763, at 59 n. 11 (Nov. 16, 1984) (J.A. at 80) ("MarAd Opinion"). As the agency noted, however, both the express terms of the statute and consistent agency interpretations of it since 1938 eviscerate this argument. *Id.*

**4.** As Justice Brennan noted in a footnote in *Seatrain*, the proportionate repayment of the subsidy does not completely neutralize the effects of the foreign-trade vessels' CDS: Congress did not require the transferred subsidized carrier to pay an added amount reflecting the interest on the loans which would have been necessary to finance unsubsidized construction. 444 U.S. at 588 n. 30, 100 S.Ct. at 810 n. 30. Presumably, for that reason Congress restricted the temporary transfers into the domestic market to six months in any one year.

**5.** The majority suggests that protection of the unsubsidized fleet is "a principal goal of the legislation." Maj.Op. at 948. Protection of the unsubsidized fleet is certainly the priority—indeed the sole *raison d'etre*—of the Jones Act, but the Merchant Marine Act of 1936 furthers other goals. Under Section 506 as amended in 1938, the Secretary *may*, of course, consider the competitive interests of the domestic unsubsidized fleet. *Atlantic Richfield Co. v. United States*, 774 F.2d 1193 (D.C.Cir.1985), holds that the Secretary has authority under the regulation at issue here to condition a temporary transfer of a subsidized VLCC into the Alaskan trade on the continued employment of four "suitable" (over 100,000 dwt) unsubsidized tankers during the applicable six-month period. *Atlantic Richfield* is decidedly not authority for the proposition that the Secretary *must* consider the interests of unsubsidized vessels she does not regard as "suitable."

task of reconciling these tensions to the agency charged with administering the statute by means of an extraordinarily sweeping delegation. *See supra* p. 944.

While nothing in the statute requires the Secretary to adopt any particular procedures to govern her consent to temporary transfers,[6] in 1977, following notice and comment, she published a regulation setting forth a framework for considering applications for temporary transfers into the Alaskan oil trade. *See* 42 Fed.Reg. 21,821 (1977); 42 Fed.Reg. 33,035 (1977), *codified at* 46 C.F.R. Part 250. That regulation, at the time acceptable to the then-existing parties in this action,[7] was intended to ensure adequate tanker transport for Alaskan North Slope oil brought to the port of Valdez through the soon-to-be completed Trans-Alaska Pipeline. 42 Fed.Reg. 33,035 (1977). The regulation embodied the Secretary's express determination that "suitable tank vessels built without CDS appear to be available to serve the Alaska-West Coast trade and Panama Canal-Atlantic/Gulf Coast trade, but that CDS vessels appear to be required to serve the Alaska-Panama Canal trade." *Id.* The Secretary expressly found that "a suitable vessel for the Alaska-Panama Canal trade is one of at least 100,000 deadweight tons." *Id.* The regulation accommodated the economics of the shipping trade by establishing expedited consideration by the Secretary of any application for temporary transfer by a "suitable" (over 100,000 dwt) CDS tanker. *See* 46 C.F.R. § 250.4 (1985). Any unsubsidized tanker could protest a proposed temporary transfer, and the Secretary would be obliged to consider any such protest.

*See id.* Indeed, the regulation went so far as to grant a veto over such applications to "suitable" (over 100,000 dwt) unsubsidized tankers available over the proposed six-month period. Apart from the protections for the unsubsidized tanker fleet built into the statute, then, the Secretary exercised her discretion to limit transfers of CDS tankers to one-third of one type of domestic trade, imposed identical suitability restrictions on both CDS applicants and unsubsidized protestants, granted "suitable" protestants a veto over temporary transfers not required by the statute, accorded *all* unsubsidized shippers opportunity for protest, and required the Secretary to consider all such protests. It is hardly surprising that the unsubsidized shippers had no objections to the regulations when promulgated.

When appellants protested these proposed temporary transfers, MarAd did not, however, merely rest on its regulation to reject their contentions. Opinion of the Maritime Administrator at 42–45, 52–60 (Nov. 16, 1984) (J.A. at 63–66, 73–81) ("MarAd Opinion"). The agency noted, reasonably, that an expedited proceeding was not the appropriate forum for arguments that a seven-year regulation was void *ab initio*. *Id.* at 42 (J.A. at 63); *see supra* note 7. It also maintained that the agency's original Federal Register notice, together with contemporaneous and subsequent agency decisions, adequately provided a statement of the regulation's basis and purpose. *Id.* at 43 (J.A. at 64). Still, despite its objections to the appellants' choice of forum and

---

**6.** As MarAd observed in its original disposition of this case, "There is no requirement that there be any rule to govern action on section 506 waivers for the Alaska-Panama Canal operations. [MarAd] could and has proceeded without rule-making on applications to operate CDS tankers in that trade for six months or less." MarAd Opinion at 43 (J.A. at 64) (footnote omitted).

**7.** While appellants would not be estopped from challenging the application of the regulation if they could show that its application were now inconsistent with the purposes of the statute, their claim that the regulation was void *ab initio*

because of its defective statement of basis and purpose is more vulnerable. *See Aluminum Co. of America v. ICC,* 761 F.2d 746, 751 (D.C.Cir. 1985) (summarizing this Circuit's inconsistent holdings). I find the majority's dicta on this point unhelpful: appellants do not challenge the statement of basis and purpose as "interpret[ed]" or "as currently being used in a particular proceeding." Maj.Op. at 950 n. 11. All their arguments concern the statement as published and the circumstances immediately surrounding its publication. Brief for Appellant at pp. 35–43.

"standing," [8] the agency set out an extended discussion of the substantive validity of the regulation both when promulgated and in the light of changed market conditions. *Id.* at 52–60 (J.A. at 73–81).

MarAd considered and rejected appellants' contention that smaller tankers should be deemed suitable for even the long leg of the Alaskan oil carriage. The agency found that "large size CDS VLCC tankers effect substantially lower rates than vessels under 100,000 DWT." *Id.* at 53 (J.A. at 74). MarAd noted that as late as 1983 it had "specifically analyzed" the economics of the Valdez-Panama run and found that ships of less than 100,000 dwt "could not be considered to be competitive with the VLCC's in the Alaska/Panama trade and that it would be unfair to both the charters and the ultimate consumer to require the charter of all available small vessels, even though they are unsuitable for the trade." *Id.* at 54 (J.A. at 75). MarAd, moreover, reviewed supervening changes in market conditions which might have undermined the vitality of the regulation, such as the significant deterioration of the coastwise and intercoastal tanker trades, *id.* at 44 (J.A. at 65), the construction of the trans-Panama pipeline, *id.*, and the annual percentages of Valdez-Panama oil cargoes carried by below-100,000 dwt tankers. *Id.* at 55–56 (J.A. 76–77). The agency's judgment that it "is not aware of any change in shipping conditions that alter these fundamental conclusions," *id.*, reflects an expertise which we are not at liberty to ignore. Finally, the agency specifically found that the disputed transfers were "necessary" (within the meaning of Section 506) because of the "anticipated surge of oil supply from the Kuparuk fields of between 80,000 and 100,000 barrels per day ...," *id.* at 58 (J.A. at 79), and that this "[n]ecessity ... does not require forcing on transportation users and consumers unsuitable vessels." *Id.* at 59 (J.A. at 80). In this context, the agency explicitly addressed the effect of the two transfers on the whole unsubsidized tanker fleet, noting the overarching protections built into the statute and regulation: "The permission is limited to the Alaska-Panama Canal trade and the temporary nature of the approval tends to limit any impact on unsubsidized Jones Act tankers." *Id.* at 60 (J.A. at 81).

The agency's explicit consideration of the interests of smaller unsubsidized tankers (which, arguably, exceeds statutory requirements) goes for naught, however, because the majority finds that it ignored the appellants' "bumping" argument. The gist of this argument is that large unsubsidized tankers did not exercise their veto right over the two applications at issue here because those tankers are profitably employed in the remaining two short-haul segments of the Alaskan oil trade, "bumping" appellants' smaller tankers out of opportunities on these routes.[9] In other words,

**8.** The "standing" issue seems to me to be a tempest in a teapot. Granted, the Administrator's opinion misuses the term, MarAd Opinion at 51 (J.A. at 72), but on the next page the Administrator makes clear what he means: under the regulation appellants had standing to protest but not the right to veto temporary transfers of subsidized tankers, because the vessels they own weigh less than 100,000 dwt. *Id.* at 52 n. 8 (J.A. at 73). Surely an administrative agency can be forgiven some confusion as to the meaning of the term as long as nothing significant turns on that confusion; After all, the judiciary also has difficulty with the concept.

The majority's treatment of the agency's misstep seems more significant. By viewing "[t]he section of Marad's opinion concerning the protests of small, unsubsidized tankers [as] devoted entirely to a discussion of why they lack standing," Maj.Op. at 947, the majority ignores the agency's examination of the *substance* of the appellants' claims. The majority's interpretation of the agency's harmless confusion over the legal term "standing" leads it to brush aside reasoning which should be read as addressing the merits of the case on the basis of agency expertise. *See, e.g.,* MarAd Opinion at 44, 52–60 (J.A. at 65, 73–81).

**9.** The majority unaccountably assumes that MarAd need only consider the effect of temporary transfers on the three segments of the Alaskan trade. I can see no reason why "bumping" should occur only within this trade, however. Presumably tankers bumped out of the Alaskan trade together would bump other unsubsidized vessels out of non-Alaskan tanker routes, and further indirect effects may occur in non-tanker unsubsidized commerce. The majority's reading of the 1936 Act as mandating "special concern" for the unsubsidized fleet, Maj. Op. at

although the temporary transfers do not directly cause the bumping, they are predicated on a bumping by unsubsidized large tankers that has already taken place, and the temporary transfers somehow reinforce the bumping.[10] At bottom, the argument is that temporary transfers cause the domestic fleet discomfort and, in this case, appellants ultimately feel the discomfort most intensely. The majority treats this argument as novel and commands MarAd to consider it.[11]

It follows, however, as the night the day, that any time partially subsidized competitors are permitted to transfer temporarily into competition with unsubsidized competitors, the unsubsidized competitors will to some degree be competitively disadvantaged. (Indeed, *any* added competition will alter, to some extent, the balance of supply and demand.) And basic economics further teaches that those competitors most vulnerable to added competition are the highest-cost competitors. As the agency has repeatedly determined, small tankers are, at least vis-a-vis large tankers, high-cost competitors. *See, e.g.,* MarAd Opinion at 53 (J.A. at 74); Order of the Assistant Secretary for Maritime Affairs, Docket No. S–682 at 3 (Jan. 9, 1981) (J.A. at 105); 42 Fed.Reg. 33,035 (1977). Surely, Congress in 1938 contemplated that temporary transfers (with or without the 1977 regulation) would cause portions of the domestic fleet some competitive discomfort. That is simply one of the inevitable tradeoffs that Congress authorized the agency to make. Therefore, that the agency's policies may favor large tankers over small is no grounds to challenge the Secretary's action

under this statute. We must bear in mind that the Act delegated to the Secretary the responsibility for determining what vessels were "suitable" for a multipurpose merchant marine. The agency has determined that "[t]he trade is enhanced by temporary employment of large, modern, efficient tankers." MarAd Opinion at 59 (J.A. at 80). This determination, embodied in the regulation and the agency's opinion, is, viewed in the harshest light, a rather obvious example of " 'a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute.' " *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 845, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984) (quoting *United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961). *See also United States v. City of Fulton,* —— U.S. ——, ——, 106 S.Ct. 1422, 1428, 89 L.Ed.2d 661 (U.S. 1986).

This court, of course, has no authority—either directly, or indirectly by ordering the Secretary to "consider" appellants' arguments—to seek a redistribution of business opportunities among types of vessels or companies. To be sure, the majority does not instruct MarAd on the result it must reach: the agency is merely required *explicitly* to measure the extent to which unsubsidized vessels will be disadvantaged when temporary transfers are proposed, and to weigh that disadvantage against whatever benefits are to be gained. Maj. Op. at 950. This finely calibrated cost-benefit analysis must, according to the majority, be conducted either through regulation or

948–49, combined with the applicable regulation's definition of "competitor" as *any* unsubsidized U.S.-flag vessel, *see* 46 C.F.R. § 250.2 (1985), suggests that MarAd would be obliged to accept comments from, and give "special concern" to, the interests of any unsubsidized vessel (tanker or not) which alleged the indirect competitive effects which the majority classes under the rubric of "bumping."

10. The majority suggests, without any record support that I can find other than assertions in appellants' brief, that companies owning both subsidized and unsubsidized VLCCs are in some

undesirable manner manipulating this process. *See* Maj.Op. at 949.

11. The record is not clear as to whether appellants presented their bumping argument to the Secretary, as it was presented to this court. It seems implicit in their protests, however—just as the Secretary's response to it is implicit in the regulation and opinion. *See* MarAd Opinion at 54 (J.A. at 75). ("[I]t would be unfair to both the charters and the ultimate consumer to require the charter of all available small vessels, even though they are unsuitable for the trade.") (citation omitted).

by adjudication. Maj. Op. at 950.[12] This strikes me as nothing less than judicial amendment of a simple statutory authorization. I do not see how Section 506, as the majority interprets it, could any longer be described as delegating to the Secretary a "highly discretionary administrative decision." *Seatrain*, 444 U.S. at 589, 100 S.Ct. at 810.[13] Requiring additional procedure (in the context of requiring consideration of all arguments presented), moreover, has substantive consequences, *cf. Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 549, 98 S.Ct. 1197, 1214, 55 L.Ed.2d 460 (1978) (footnote omitted): the Secretary will naturally be more reluctant to consent to temporary transfers when the cost in agency resources of doing so will be so substantially increased. Indeed, although the majority insists that the Secretary need not perform this careful cost-benefit analysis with respect to every temporary transfer, the logic of the majority opinion strongly suggests otherwise. Each proposed temporary transfer will surely have a somewhat different economic impact and therefore, if protested, would require MarAd to explore its unique market effect down a lengthy chain of competitive causation, until the agency finds the proximate injured party.[14]

Because I cannot find the majority's requirements in the broad delegation of the statute, I would affirm the Secretary's decision, and that of the district court.

12. Given the subtlety of this inquiry, should MarAd choose to proceed by adjudication it is unlikely that a competent analysis could be completed by the end of the six-month term of the transfer, much less within the thirteen working days mandated by the present regulation. *See* 46 C.F.R. § 250.4 (1985).

13. *Seatrain*, cited by the majority as support, seems to me to cut against the majority's position. There the Supreme Court, reversing this court, held that the Merchant Marine Act delegated to the Secretary discretion so broad as to encompass the authority to permit the permanent transfer of a subsidized tanker into the domestic fleet, upon full reimbursement of the CDS, a power not specifically granted in the statute. This case, it would seem, presents far *stronger* grounds for sustaining the Secretary's exercise of her discretion.

14. Indeed, the majority has suggested no persuasive reason why the agency would not, under its holding, be required to perform a similar inquiry for the subsidized fleet whenever it received an application for a temporary transfer. Maj.Op. at 948 n.6. Surely subsidized vessels in our foreign commerce could be disadvantaged by failure to allow a competing subsidized vessel to transfer into the domestic trade. The agency would therefore seem, under the majority's logic, to be required to consider the economic consequences of granting an application for a temporary transfer on the totality of the unsubsidized tanker and non-tanker fleet, on all domestic routes, and to consider the economic consequences of *not* granting it on the totality of the subsidized tanker and non-tanker fleet, on all foreign routes. The agency's task would be limited to considering the impact on the domestic fleet only if the Act gave a clear priority to the interests of the unsubsidized fleet. But the Act explicitly found necessary a merchant marine sufficient for both our domestic maritime commerce and a substantial portion of our foreign maritime commerce. 46 U.S.C. § 1101.